FARWELL et al. v. HOME INS. CO. OF CITY OF NEW YORK.

(Circuit Court of Appeals, Fifth Circuit. March 28, 1905.)

No. 1,379.

1. REFORMATION OF INSTRUMENTS—INSURANCE POLICIES—FAILURE TO READ—NEGLIGENCE.

Complainant employed brokers to obtain $60,000 of insurance on plantation buildings, which it was found necessary to distribute among 20 different insurers. In order to have the policies read exactly alike, riders were printed containing a description of the property, and a provision for concurrent insurance to the extent of $60,000, which were used on all but one of the policies, on which a printed rider previously used by complainant's grantor, providing only for $45,000 concurrent insurance, was used by mistake. The policies were similar in form, each containing about 4,000 words. *Held*, that the complainant was not guilty of negligence in failing to read the policy before loss and discovering the mistake, precluding a reformation.

[Ed. Note.—For cases in point, see vol. 28, Cent. Dig. Insurance, §§ 265–272.]

2. SAME—EVIDENCE.

In a suit to reform an insurance policy, the evidence was held to require a finding that a rider only authorizing $45,000 concurrent insurance had been attached to the policy, by mistake of both parties, in place of a rider provided, authorizing concurrent insurance to the extent of $60,000.

Appeal from the Circuit Court of the United States for the Eastern District of Louisiana.

S. Wolff, J. D. Rouse, and William Grant, for appellants.

John Clegg and Lamar ·C. Quintero, for appellee.

Before PARDEE, McCORMICK, and SHELBY, Circuit Judges.

SHELBY, Circuit Judge. The appellants, Charles A. Farwell and two others, citizens of Louisiana, brought this suit in equity against the appellee, the Home Insurance Company of the city of New York, a corporation organized under the laws of New York, to reform a fire insurance policy for $2,500 issued to the complainants by the defendant company. The policy, as issued, allowed concurrent insurance for only $45,000, and became void if insurance was had for a larger sum. The assured obtained insurance, including the $2,500—the amount of the policy in question—for $60,000. The policy, as issued, was thereby made void. The bill seeks to have the policy reformed so as to permit, by its terms, concurrent insurance to the amount of $60,000. The case was tried on its merits. The Circuit Court dismissed the bill, and the complainants appealed to this court.

The bill, answer, and evidence show many facts about which there ·is no controversy, and yet it is necessary to make a. condensed statement of them, for they greatly aid, we think, in pointing to a correct and just answer to the one controverted question of fact, to wit, whether or not $45,000, instead of $60,000, was by mutual mistake fixed as the amount of concurrent insurance allowed by the terms of the policy.

The policy sought to be reformed is dated September 27, 1902, and was issued by the defendant company from the office of Peter F. Pescud, insurance agent. It covers the buildings and fixed and movable machinery of all kinds situated on the Ashton Plantation, in the parish of St. Charles, La., and, as issued, contains the words "$45,000 total insurance permitted concurrent herewith." The premium was duly paid by the complainants. The property insured was totally destroyed by fire, and proof thereof was duly made.

The Ashton Plantation formerly belonged to Emile Legendre, who sold it to the complainants in September, 1902. While Mr. Legendre owned the property, he obtained insurance upon it to the amount of $45,000, $5,000 of which was issued through Peter F. Pescud, insurance agent. Mr. Legendre obtained the $45,000 insurance from several different companies. In order to have all the policies alike, he had printed a number of forms to be used as riders, which contained a description of the property and a statement of the amount of concurrent insurance permitted. One of these riders or forms was to be attached to each of the policies. For convenience of reference, they will be called hereafter the "old form." They were furnished the agents of the several insurance companies to whom Mr. Legendre made application for insurance. Such forms were furnished Peter F. Pescud, insurance agent. After the complainants became owners of the property, they employed Brand & Bush, insurance brokers, to obtain insurance for them upon the property for $60,000. Brand & Bush prepared and had printed a large number—perhaps 250—forms or riders,

describing the property, and providing $60,000 as the total insurance permitted. These forms (hereafter designated as the "new form"), in general appearance, were substantially like those which had been printed for Mr. Legendre. They were distributed by Brand & Bush among the agents of the several insurance companies of whom they sought the $60,000 insurance. They obtained insurance for the complainants from 19 different companies for sums ranging from $1,000 to $7,000; the aggregate amount of the 19 policies being $57,500. In each of these 19 policies the new form, allowing concurrent insurance to the amount of $60,000, was used. The $2,500 policy issued by the defendant company, which is in suit here, is required to complete the amount of $60,000. There is no dispute or controversy as to the 19 policies. After the fire which destroyed the property insured, these 19 policies were paid. The defendant company refused to pay the policy in question, claiming it was void, because by its terms only $45,000 of concurrent insurance was allowed, and the complainants, they claim, had made the policy void by obtaining insurance for a greater sum. The only material difference between the policy in question and the other 19 policies is as to the amount of concurrent insurance. The fact is that the agents of the defendant company, in issuing the policy, pasted thereon one of the old forms, instead of one of the new forms. Brand & Bush, who were intrusted with obtaining the $60,000 insurance, did not, of course, intend to obtain the policy which permitted only $45,000 of concurrent insurance. There is no controversy in the case, and no room for controversy, about the fact that, so far as Brand & Bush are concerned—and they were the agents of the complainants—there was a mistake in using the old form instead of the new one. The controverted question is as to whether or not the defendant company had knowledge of the fact that insurance was being obtained to the amount of $60,000, and intended to issue a policy that would permit such insurance, and by mistake used the old form. The evidence which bears directly on that point must be briefly stated.

It is shown without conflict that Mr. Robert Gottschalk was in charge of Pescud's office, and had full authority to represent the defendant company. Mr. W. A. Brand, of the firm of Brand & Bush, testified that he did not authorize the use of the old form in the issuance of the policy, and that, at the time the policy was written, Mr. Gottschalk was familiar with the amount of insurance which was to be had on the property. This witness was asked, "What did you tell him [Gottschalk] was the gross amount of insurance you were trying to place?" And he replied: "$60,000. Q. Did you tell him that before or after the policy was issued? A. Before." This witness says that he is quite certain that he furnished Mr. Gottschalk with the $60,000 forms which he had printed. Duncan J. Arnoult, who was connected with the firm of Brand & Bush, testified that he showed Mr. Gottschalk one of the new forms. Arnoult testifies that, representing Brand & Bush, the complainant's agents, he went to Pescud's office, and saw and talked to Mr. Gottschalk; applying to him for part of the $60,000 insurance. On this visit, and in connection with the application, he showed him the new form. Both Brand and Arnoult testify posi-

tively to conversations in which they informed Gottschalk of the purpose to insure the property for $60,000, and this occurred before the issuance of the policy. The fact that these conversations occurred in relation to the insurance, Gottschalk does not deny, except to the extent of saying that the amount of insurance sought—$60,000—was not mentioned. Is it reasonable that, in obtaining 20 policies as a part of one plan to insure the property for $60,000 Brand & Bush would have made the amount known in 19 instances, and failed in the twentieth, when the same opportunities were had for conveying the information?

The following excerpt from Brand's deposition points to the way in which the mistake probably occurred:

"Q. And you are quite sure you sent a copy over to Mr. Pescud? A. I am. [Witness is speaking of the $60,000 form.] When I went there after it was discovered that this was the wrong form, I asked Mr. Gottschalk how he came to make such a mistake; and he turned to a young man and asked him where he got the form, and he said he used some of those he had in the office, which had been left there for Emile Legendre's sugar house. Q. The conversation you had respecting what you term a mistake in the policy occurred between you and Mr. Gottschalk after the fire? A. Yes, sir. Q. Did Mr. Gottschalk say that that was a mistake then? A. Well, he turned to the boy and asked where he had gotten the form. Seems he knew it was a mistake, because I tried to get more from him on the $60,000 form, but he declined to take it. We did a large business together, and I always offered it to him when I could."

On this point Gottschalk testified:

"Q. When your attention was called by him [Brand] to the fact of the printed form attached to the policy, which specified the amount of the risk—the total risk—upon that property was $45,000, didn't you turn to a young man in your office, and ask him where he got it? A. I might have. Q. Did he not say, 'I took one of the forms of the Legendre policy found in the office'? A. I don't recollect that at all. Q. What was that young man's name? A. Bulber. Q. Is he in your employ now? A. Yes, sir. Q. What is his first name? A. Eugene."

Eugene Bulber was not examined as a witness, and the record does not show why he was not made a witness.

The record shows that there was some correspondence between Mr. Gottschalk and the defendant company in reference to the insurance in question. This correspondence was asked for by the complainants on the taking of the proof, but it does not appear in the record. It is not improbable that it would show whether the insurance was to be on a basis of $45,000 or $60,000. Mr. Farwell, one of the complainants, testifies that, when Pescud sent to collect his bill for the premium on the policy, he referred him to Brand & Bush, saying that he (Farwell) would settle with them. Gottschalk confirms this, saying that Brand came to the office "some time between the date of the policy and the issuance of the policy—the issuance having been delayed on account of correspondence—and asked me, inasmuch as he had the balance of the insurance, if he would permit this transaction to go through his office; and I felt he referred particularly to the commission on the premium, and I instructed our bookkeeper to let that policy go to Mr. Brand's account, and it was charged to his account." This is significant as showing that Gottschalk admits in every instance his coming in contact

with Brand and Arnoult, and the conversations about the policy, but in no instance does he remember that the amount of the concurrent insurance was mentioned. Are we not justified in believing confidently that Mr. Gottschalk is mistaken? Brand's firm had been employed for the express purpose of securing $60,000 of insurance. It had to be secured in small sums from a large number of companies—from 20, as the result showed. He had 200 or 250 forms printed. These forms were distributed among the various insurance agents in New Orleans. They were furnished to be used on the policies making up the $60,000. Nineteen of the forms certainly reached the several offices, for they were used on 19 policies. Brand says that he sent the forms, and Arnoult says that he carried them to Pescud's office, where Gottschalk was in charge. Brand and Arnoult say that on several occasions they told him that the insurance sought was $60,000. Can we believe it to be true that, with all these opportunities, the complainants' agents failed to let Gottschalk know they were seeking $60,000, and not $45,000, insurance on the property? We are convinced by the evidence that he was informed as to Brand's purpose to secure for the complainants $60,000 of insurance. We do not think that, with knowledge of that fact, Gottschalk would have intentionally used the old form, limiting the insurance to $45,000, and no such charge is made; nor do we think that he would have collected the premium on the policy, knowing it to be void. We believe his memory is in fault. We find the evidence clear and convincing that the old form was attached to the policy by the mistake of the defendant company's agent. Considering all the witnesses as equally credible, we are constrained to reach this conclusion from the weight of the evidence on the question in dispute, and by many facts and circumstances about which there is no dispute.

It remains to apply the law to the foregoing facts and conclusions.

It is unquestionably the rule that, to entitle the complainants to relief, the evidence must be clear, unequivocal, and convincing. United States v. Budd, 144 U. S. 154, 12 Sup. Ct. 575, 36 L. Ed. 384. We find the evidence fills the measure of this rule, for it leaves in our minds no substantial doubt that a mutual mistake has occurred.

It is urged that the negligence of the complainants in failing to read the contract of insurance is such that they should be deprived of the right to relief. And in that connection our attention is called to the indorsement on the back of the policy: "It is important that the written portions of all policies covering the same property read exactly alike. If they do not they should be made uniform at once." This language would not necessarily call attention to the printed rider or form attached to the policy. The policy was written by an agent having authority from the defendant company to write it. The complainants' agents had informed the defendant's agent that insurance to the amount of $60,000 was desired and applied for, and printed forms to that effect were furnished him. The complainants' agents would naturally expect the defendant's agent to use the form furnished, and not to use an old and discarded form, that would, under the circumstances, make the policy void. While not directly in point, the ob-

servations of Mr. Justice Miller in Williams v. North German Ins. Co. (C. C.) 24 Fed. 625, 626, are pertinent:

"Where an instrument fails to represent what both parties intended to have it represent, and one party had drawn up the instrument, and the other party merely accepted it, and the fault was on the party drawing up the instrument, it can be reformed. It would be a harsh rule if a person applying to an insurance agent, who is supposed to know the legal value of the language used in such policies, which he is drawing up every day, and who is supposed to know exactly what is desired—if that agent fails to do that which was intended, it would be harsh to say that the instrument shall not be reformed, and that chancery shall not give relief."

Moreover, there are facts peculiar to this case tending to answer the contention that the complainants were negligent in failing to discover the mistake before the fire. To obtain the amount of insurance they sought, they received 20 different policies in 20 different companies. If ordinary care required them to read one, it required them to read all. They were all on standard forms. Each of them had pasted on it a printed form headed; "Ashton Sugar House," containing a description of the property insured, a statement of the amount of concurrent insurance allowed, and other matters. The entire policy contained, in all, about 4,000 words; and the twenty policies, about 80,000 words. Would it not be too stringent to hold that the complainants were guilty of culpable negligence in failing to read these policies? The ordinarily careful business man would probably have only looked at them to see that all were properly signed, and that the forms descriptive of the property were attached. The evidence shows that some such examination was made, but the difference in appearance between the old and new forms being slight, the fact that an old form had been pasted on 1 out of the 20 policies was not discovered. It has been held, even where the case was not complicated by the submission of a number of policies, that "a plaintiff is not, by neglecting to read his policy, guilty of such laches as to bar him from seeking to have the policy reformed to agree with the contract he made." 2 May on Insurance (4th Ed.) § 566, p. 1334. Fitchner v. Fidelity Mutual Fire Association, 103 Iowa, 276, 72 N. W. 530; Barnes v. Hekla Fire Ins. Co., 75 Iowa, 11, 39 N. W. 122, 9 Am. St. Rep. 450; Palmer v. Hartford Ins. Co., 54 Conn. 488, 9 Atl. 248. The highest possible care is not demanded. The complainants were not guilty of such negligence, in our opinion, as deprives them of the right to have the contract reformed. See 2 Pomeroy, Eq. Jur. (2d Ed.) § 856.

There are other facts and circumstances in the case which we have considered, but it is impracticable to comment on all of them without making the opinion longer than the transcript.

No universal rule has been formulated in text-book or opinion to show in all cases when contracts may or may not be reformed. We examine and decide this case only in the light of its own inherent facts. We have been caused to hesitate only by the fact that the able and careful trial judge reached a different conclusion. The evidence, however, is so convincing that we are constrained to dissent from his view.

The decree of the Circuit Court must be reversed, and the cause remanded, with instructions to enter a decree for the complainants.