CITY OF LAWRENCEBURG v. MARYLAND CASUALTY CO.

Middle Section. January 30, 1933.

Petition for Certiorari denied by Supreme Court, May 20, 1933.

240

E. E. McNely and Noble L. Freeman, both of Lawrenceburg, for complainant.

Chas. C. Trabue, of Nashville, and John G. Crews, of Lawrenceburg, for defendant.

DeWITT, J. In this cause the chancellor awarded to the city of Lawrenceburg a recovery of $9,074.75 and costs against the Maryland Casualty Company upon a policy issued by defendant on August 6, 1924, insuring the municipal corporation "against loss from liability imposed by law upon the assured for damages on account of bodily injuries, including death, resulting therefrom, accidentally suffered or alleged to have been suffered by any person or persons, not employed by the assured, while within or upon the premises described in the schedule hereof, or upon the sidewalks or other ways immediately adjacent thereto." The insurance was expressly provided in accordance with limitations stated in a specific agreement, made a part of the policy and embodying certain special conditions and stipulations as to the premises covered, as follows: "Streets, sidewalks and four municipal buildings."

In June, 1925, one man was killed and another was injured by accidental contact with a charged guy wire of a power line owned and maintained by the municipality about two and one-half miles from the corporate limits of the city. Actions for damages were brought, resulting in judgments against the city for $6,500 in favor of the administrator of the deceased man, and for $200 in favor of the man who was merely injured. These judgments, with interest, costs, and attorney's fees, were paid by the municipality. The policy limited the liability of the insurer for loss on account of one person injured or killed to $5,000; and it obligated the insurer to pay not only the amount, within such limit of any judgment rendered for damages for accident occurring as contemplated in the contract, but also the interest on the judgment, costs, and all expenses incurred in the defense of such an action; it being provided that the insurer would defend in the name and on behalf of the city any suits or other proceedings which might at any time be instituted against the city resulting from such accidents. No question is made as to the amount awarded by the chancellor, except as to the amount of interest allowed, but the casualty company insists that the accidents for which the municipality was compelled to pay damages were not covered by the provisions of the policy; that these accidents occurred neither upon the streets, sidewalks, or four municipal buildings nor upon the sidewalks or other ways immediately adjacent thereto. The city owned four buildings—its city hall, within its corporate limits, a pumping station about one mile west of the city, an old old power plant about one and one-half miles southwest of the city, and a new power plant located on Shoal creek about two and one-half miles southwest of the city. The accidents to the two men occurred on a steep bank or bluff overlooking Shoal creek about one-fourth of a mile from the new power plant which was situated by a dam across Shoal creek. From this new power plant a power line stretched across the creek to a pole on the east bank and then on poles running up the bank over a strip of land, on which the city had an easement, to a road; thence eastwardly along the road to the Jackson highway; thence along this highway northwardly about two miles to the city of Lawrenceburg. The accident occurred at a place on the bank or bluff about fifty or seventy-five feet from the creek, and about two hundred yards from the place where the power line reached the road. Prior to the erection of the power line, the territory extending from the road to the creek was in nothing but woods. The city obtained a right of way thereon for its power line and cleared a strip about fifty or sixty feet wide for that purpose. The right of way ran along a steep and rocky hill, and it was used by employees of the city in maintaining and keeping in repair the power line.

This right of way was not used as a passway by the public, al-

though some persons other than employees of the city did occasionally use it. The power line from the city along the highway, the road, down the hill and over the creek, was about four miles long. The city had a right of way for this whole distance for the power line. It will be remembered that the place of the accidents was one-fourth of a mile from the power house, and there was a body of water intervening, over which access to the power house could be had only by boat.

Assuming that the power house was one of the municipal buildings contemplated, it must yet be determined whether or not the place of the accident was comprehended within the description, "other ways immediately adjacent thereto," for it was not upon a sidewalk, nor was it upon a street. We are unable to conclude that this place was upon a way immediately adjacent to the power house or to any street or sidewalk. Words must be interpreted according to their plain and ordinary meaning. It is not for the court to give a strained and unnatural meaning to the words of a contract, for thereby the court would be undertaking to make a new contract for the parties, and this, of course, it cannot do. The word "adjacent," in its natural and primary sense, means "near to" or "neighboring." It does not import a physical contact with something else, as does the word "adjoining." Henderson's Lessee v. Long, Cooke, 128, Fed. Cas. No. 6,354; 1 C. J., 1196, and cases cited. But, when qualified by the adverb "immediately," it necessarily means "contiguous" or so close to the other object as to be almost in contact with it. Tudor v. Chicago, etc., R. Co. (Ill.), 27 N. E., 915. We cannot see how the place of the accident, on a way which was not a street or a sidewalk, on a steep, rocky hillside not used by the traveling public, separated by a body of water from the nearest municipal building one-fourth of a mile distant, could reasonably be considered as on a way immediately adjacent to any street, sidewalk, or municipal building.

However, the bill was sustained also under its prayer in the alternative for reformation of the contract so as to include accidents at the aforesaid place. The grounds and prayer for such reformation were set forth in amendments to the original bill. The averments are as follows:

"The complainant would further state and charge that it was represented to said complainant by said defendant company, and its duly authorized agents and representatives, at the time of the taking out of said liability Policy No. L 75595, that, among other things, said policy protected said City of Lawrenceburg from all loss imposed by law by reason of bodily injury or death accidentally sustained by any person or persons not employed by said city, occasioned by the city's operation of its electric power line and its water and light or power plants, both in and without the corporate limits of said city, and that such was the exact and real agreement and especial

understanding between the parties hereto, and represented one of the principal purposes and objects that induced the complainant herein to take out and purchase said liability policy involved in this cause.''

We must begin with the presumption that the policy embodies the entire contract of the parties. Accordingly, where the mistake is denied, the burden is on the party alleging the mistake to prove the mistake alleged and that the written instrument on account of the mistake does not fully or truly state the agreement or intention of the parties, and also to establish what was the true agreement or intention. 23 R. C. L., 365; 53 C. J., 1026; Moreau v. Edwards, 2 Tenn. Ch., 347. This burden can only be sustained by proof which is clear, cogent, and convincing. Relief against omissions in written contracts can only be granted upon proof entirely satisfying to the court. A mere preponderance of evidence is not sufficient. 23 R. C. L., 367; 53 C. J., 1026, 1030; Jones v. Jones, 150 Tenn., 554, 266 S. W., 110; Battle v. Claiborne, 133 Tenn., 286, 180 S. W., 584; Fuchs v. Fuchs, 2 Tenn. App., 133; Sands v. Hickman, 3 Tenn. Civ. App. (3 Higgins), 280; Clack v. Hadley (Tenn. Ch. App.), 64 S. W., 403; Eatherly v. Eatherly, 1 Cold., 461, 78 Am. Dec., 499; Cromwell v. Winchester, 2 Head, 389; Barnes v. Gregory, 1 Head, 230. In Henderson v. Henderson, 159 Tenn., 126, 17 S. W. (2d), 15, 16, the rule was stated as follows:

''In cases of specific performance and reformation, courts of equity exercise a discretion, and, if the proofs are doubtful and unsatisfactory, and the alleged fraud or mistake is not made entirely plain, equity will withhold relief upon the ground that the written paper ought to be treated as a full and correct expression of the intent of the parties''—citing Davidson v. Greer, 3 Sneed, 384; Bailey v. Bailey, 8 Humph., 233; Perry v. Pearson, 1 Humph., 438; Battle v. Claiborne, supra.

The question is whether, according to these rules, the city has made out a case for the relief which it asks.

Prior to August, 1923, an accident occurred in the home of a user of current supplied by the city; injury being suffered from contact with the current. On account of possible claims for damages from subsequent accidents, the city obtained a policy of liability insurance from the Hartford Accident & Indemnity Company for the period of one year, paying therefor a premium of $500. This policy was issued by the company through the local agency of one Paris. When this policy expired, a new policy, being that sued on in this cause, was obtained from the Maryland Casualty Company through the local agency of one Reese. The first policy was returned to the Hartford Company upon its expiration, and it could not be produced in evidence. Parol evidence is relied on as to the extent of liability of the city provided in said policy; and this is the basis for the insistence that the further evidence shows that the policy herein sued on covered the accident at the place hereinbefore described. In other words,

parol evidence is adduced to show that the Hartford Company insured the city against such accident at such place, and that it was the agreement of both parties that the Maryland Casualty Company should also insure the city against such accident, and that the policy herein sued on omitted by mistake so to provide.

As to the first policy, Mr. Paris testified that "it was to protect the city from accidents arising by means of their operation of the city power and light over the lines, maintenance and extension of lines of the city's operation." There was an indorsement later on "to protect the trucks, teams and push carts." In answer to a further question, he said, "It covered all operations of the city power and electric light plant."

Mrs. Paris, who was a partner with her husband in the insurance business, testified as to the first policy, "This policy covered all operations of the city for public liability protection on their electric light and power plant, including extension and maintenance of lines inside and out of the corporation."

Mr. Vaughan, mayor of Lawrenceburg 1923-1927, testified that the first policy "afforded the city protection against injury to anyone in our city municipal plants or along the city electric lines."

Mr. H. B. Watkins, who was city clerk in 1924, testified that this policy purported to cover all operations of the city.

Mr. Nixon, who was at that time superintendent of this municipal electric plant, testified that it was at his suggestion that the city obtained the insurance, and that it was for the city to have full protection, and that he was "led to believe" that the policy covered the city against accidents that should be caused by the operation of its plants, both within and without the municipal corporation. He did not testify that he ever read the policy.

Mr. J. P. Watkins, who was assistant city clerk 1923-1927, testified that the accident occurring prior to August, 1923, resulted in the electrocution of two boys in a milkhouse on a farm outside of the city, that the electric current came from the city power line, and that damage suits were brought against the city on account of said accidents. These statements were evidently given as tending to explain why the city obtained liability insurance and extended the insurance to the operations of the electric plant.

Mr. H. V. Brewer, a city commissioner 1920-1927, testified that it was his understanding that this first policy covered all accidents occasioned by the operations of the city's power plant, that he considered that the greatest danger would be around the power lines or at the power house, and that they wanted complete coverage.

The foregoing is a summary of all the testimony relied on to show that the policy issued by the Hartford Company covered indemnity against loss occasioned by such an accident as that which occurred at the place in question in this cause.

The evidence relied on to support the conclusion that the real agreement was that the Maryland Casualty Company would also insure the city against such accident as aforesaid is as follows: It appears without dispute that the premium on the policy sued on was $500, the same as the premium on the previous policy. The policy sued on was issued when Mr. Vaughan was mayor. He was asked and answered:

"Q. Was it represented to you by the authorized agents of the Maryland Casualty Company that when you took the policy it gave the city the same protection as did this Hartford Accident Indemnity policy that you had previously been carrying? A. It was."

Mr. Vaughan, when asked why the change from the one company to the other was made, stated that the different companies were bidding for the insurance, that one of the commissioners, Mr. Brewer was insistent that they change to the Maryland Casualty Company, and so it was done. The evidence shows that there were two agents for liability insurance companies at that time doing business in Lawrenceburg. One of these was Mr. Paris, who wrote the first policy, and the other was Mr. Reese, representing the Maryland Casualty Company. The change was made in order that the city might give patronage to both agents. Mr. Vaughan, when asked again what was his understanding as to the extent of protection afforded the city under this policy, said that, as he remembered it, the Hartford Accident Insurance policy afforded protection to the city against all accidents that might occur in their city plants and on all electric lines belonging to the city, and that Mr. Reese, the agent for the Maryland Casualty Company, represented to him that this policy afforded the same protection. Mr. Vaughan testified that he left to the state agent of the Maryland Casualty Company the actual writing of the policy, and that he did not remember whether or not he read the policy prior to accepting it, that as a business man he felt justified in leaving this to the representatives of the Maryland Casualty Company, as they were more familiar with insurance forms, and that he as a business man would not have agreed to cancel a policy which gave the city protection and take out another liability policy at the same cost which did not give the city equal protection.

Mr. Paris testified that, when the commissioners refused to renew the insurance in his company, he had a talk with them, and from their conversation he understood that the Maryland Casualty Company's policy gave to the city the same protection at the same rate as that given by the Hartford Company's policy.

Mr. H. B. Watkins testified that in August, 1924, the policy sued on was submitted for acceptance to the board of commissioners by Mr. Reese and some agent from Nashville said to represent the Maryland Casualty Company, who made a statement to the board that the city had full protection as before by the Hartford Company's policy. He testified that he did not know whether or not the said

representative from Nashville was an official of the company, but that he was represented as being the company's representative, and he did not remember his name. He said that there was a general discussion about the matter, and this representative said that the city was fully protected under this policy in its operations as against all accidents to the public other than city employees. He was again asked, and he answered as follows:

"Q. Was there or not any occasion or cause or reason for the City Commissioners to examine this Maryland Casualty Indemnity contract at any time from the time of its purchase until the claims were filed or suits brought growing out of the Dyer death and the Marlow injury? A. I know of no particular reason why.

"Q. Was there or not in the representations of the agent or agents of the Maryland Casualty Company to the City Commissioners, at the time or times they were trying to sell this indemnity policy in the Maryland Casualty Company that the policy did not cover all places and parts of the city's power, light and water systems but that the policy merely covered certain places or localities in said system? A. It was represented that the city had full coverage in their operations as I understand it. As I remember there was nothing said as to what particular coverage other than it was to be complete."

Mr. J. P. Watkins testified that in the summer of 1924 Mr. Reese solicited the insurance, that with him was another representative of the Maryland Casualty Company and they appeared before the board of commissioners, and that he was present at the meeting. When asked what coverage the agents said that the city would have under this policy, he said, "The best I remember, they stated that the city had full coverage with their company." He said that it was his understanding that the city wanted protection so that, if any claims for damages arose, it would be insured, and that it was in the light and power business. He repeated his statement that the agent said that the city would be covered against loss by their policy.

Mr. H. V. Brewer testified that this policy was submitted to the commissioners by Reese, the local agent and a special agent of the Maryland Casualty Company, who he thought was from Nashville, but he did not remember his name; that there was a full discussion as to the extent of coverage or protection that this policy was presumed to give to the city; that they represented to the commissioners that the policy covered liability from accidents that might occur on any or along the lines of any of the city property; that it was their understanding that it covered all accidents occasioned by the operations of the city's power plants to persons not employed by the city; that this was the main reason why they accepted the policy; that this was the impression that they got from the representation made to them; and that they relied upon this representation. He said that he considered that the greatest danger would be around the power lines or at the power house. He was further asked and answered:

"Q. Would you have taken this insurance at all, that is, as one of the Commissioners voted for its acceptance, if it had been represented to you that it only covered accidents in the municipal building and not along the power lines? A. No sir, we wanted complete coverage.

"Q. And that is what you thought you were buying? A. Yes that's what we thought we were buying complete coverage is what we thought we were buying.

"Q. And that is what the Maryland State agent and local agent represented to the city that it was getting? A. That's the impression that was left with us.

"Q. Well was that their representations? A. Yes sir."

All of this parol evidence was objected to as inadmissible, and it is insisted that it was error to overrule the objections to testimony to prove the contents of the Hartford Company policy and testimony of the city officials and others to the effect that they "understood," or that they "were under the impression," that the policy sued on would cover and include the area in which the accident happened. It is admitted that, under the prayer for reformation, oral testimony might be admissible, but it is insisted that such testimony must reasonably relate to the specific language of the contract. In 23 R. C. L., 366, it is stated as practically a universal rule "that in suits to reform written instruments on the ground of fraud or mutual mistake, parol evidence is always admissible to establish the fact of fraud or of a mistake, and in what it consisted, and to show how the writing should be corrected in order to conform to the agreement or intention which the parties actually made or had," citing cases. See, also, Barnes v. Gregory, 1 Head, 230. It is true that chapter 441 of the Acts of 1907, Shannon's Code, section 3275a1, provides that every policy of insurance shall contain the entire contract of insurance between the parties thereto; but equity has jurisdiction to reform such contract, even though the statute require that the whole agreement between the parties shall be expressed in the policy. American Merchant Marine Insurance Co. v. Tremaine (C. C. A.), 269 F., 376.

The evidence objected to was relevant, and therefore admissible, although the objections thereto would go to its weight and sufficiency.

No evidence was introduced by the defendant company to overthrow the aforesaid testimony. The presumption from failure to introduce as a witness a person available having knowledge material to the issue, that his testimony would have been unfavorable to the party who could have introduced him, is not invoked by the appellee. It does not appear that either Reese, the local agent, or the agent or representative from Nashville, was still in the employ of the defendant or available as a witness. The record is silent as to their whereabouts. No effort was made to show that either of them could have been produced as a witness and his testimony taken. The presumption therefore will not be applied.

The evidence is convincing to us that the policy of the Hartford Company did insure the city against liability from damages for casualties occurring in the maintenance and operation of its electric lighting plant, including such accidents as those giving rise to this suit. It is highly improbable that the city officers would discontinue such a policy giving full protection and substitute therefor another policy at the same rate of premium which would exclude any risk, much less such a serious risk covered by the policy which was discontinued. There was no motive, necessity, or consideration for change from such a particular and inclusive policy to one less inclusive. In such cases it has been held by two learned courts that a relatively small amount of clear and credible evidence will establish the mistake. Upson Nut Co. v. American Shipbuilding Co. (D. C.), 251 F., 707; Biser v. Bauer, 205 F., 229, 123 C. C. A., 417.

It is clear that the officers of the city wanted this complete coverage; that they were unwilling to insure with the Maryland Casualty Company unless it would agree to furnish such coverage. In some of the testimony the witnesses did testify in part from what they understood or what was their impression, but it is clear that there was a full discussion between the agents of the company and the commissioners of the city, in which it was made plain that the city wanted the full insurance given by the policy expiring, and that this was agreed to by the agents. It appears that the local agent had for years been a resident of the city and very familiar with the electric light and power plant of the city, the location of its lines and power houses. He certainly was not misled as to what was wanted. The testimony of Messrs. Vaughan, H. B. Watkins, and Brewer is direct and unequivocal, not based upon confused and vague recollection, not only as to what the city wanted and stipulated for, but also as to what the defendant's agent agreed to furnish as liability insurance. Whatever was the understanding of the officers or agents of the company having authority to sign and issue the policy is another matter. The company had empowered these negotiating agents to represent it and to make the contract for the insurance. Such local and soliciting agents must be regarded as agents of the company issuing the policy and not the agents of the insured. Chapter 442, Acts of 1907, Code, section 6087. Under this statute the acts of such agents are binding upon their principal, the insurer. Maryland Casualty Co. v. McTyier, 150 Tenn., 691, 266 S. W., 767, 48 A. L. R., 1168.

On the part of the complainant city, there was a mistake in the provisions of the policy. Its officers were led to rely upon representations and assurances made by defendant's agents. If these agents honestly intended to bind the company to the full coverage, or if they believed that a policy specifying coverage, as this policy did, included full coverage, they also made a mistake, so that the mistake was mutual. If these agents making the assurances and

agreement intended that the policy when issued should not include the full coverage, they were guilty of fraud, and it was mistake of the insured induced by the fraud of the insurance agent, binding on the insurer. In either view the city would be entitled to recover.

In such a case the insurer is not entitled to invoke the rule that the negligence of the insured in failing to read and understand the policy, and in retaining it, will preclude relief in equity. It will not work an estoppel upon the assured. In 26 C. J., 107, the rule is stated that a mere failure to read the policy, especially if it is a renewal, is not such negligence as will defeat the right to reformation, citing Palmer v. Hartford Insurance Company, 54 Conn., 488, 9 A., 248; Roberts & Son v. National Insurance Company, 2 Ohio App., 463. In 2 Cooley's Briefs on Insurance, page 1427, it is stated in the text that the rule that the negligence of the insured in retaining the policy will preclude relief in equity is not strictly applied. In Stevens v. Equity Mutual Fire Insurance Co., 66 Mont. 461, 213 P., 1110, it was said that an insured has a right to rely on the good faith of insurer and his agent, and it is not carelessness on his part to suppose that a policy has been issued that will give protection under the stated facts relating to the application, and, in an action for a fire loss where the policy did not conform to the statements made by the insured to the agent taking the application, the failure of the insured to inspect a policy after the receipt was not negligence barring recovery in action to reform the policy. The same rule was applied in Farwell v. Home Insurance Company, 136 F., 93, 68 C. C. A., 557, and in Merchants' & Manufacturers' Inter-Insurance Alliance v. Hansen (Tex. Civ. App.), 258 S. W., 257.

The defense of laches is not available, for there is no evidence that lapse of time has prejudiced the rights or interests of the defendant company. It appears that, immediately after the accidents occurred, the city gave notice to the company of the accidents and called on it to defend the actions for damages, and that the company refused so to do on the ground that it had not insured against liability from such accidents. The city then defended the actions, employing able counsel, and made all necessary efforts to avoid liability. There is no evidence that anything was omitted by the city which would have been done had the defendant company employed counsel and made other necessary expenditures to defend the action. There has been no loss or impairment of evidence, and no rights of third persons have intervened. The true rule of laches is that it is not, like limitation, a mere matter of time, but is particularly a question of the inequity of permitting a claim to be enforced; this neglect being founded on some change in the condition or relation of the property or the parties. In other words, it is not merely delay, but delay that works a disadvantage to another. 10 R. C. L., 396; Galliher v. Cadwell, 145 U. S., 368, 12 S. Ct., 873, 36 L. Ed., 738; Parker v. Bethel

Hotel Co., 96 Tenn., 252, 34 S. W., 209, 31 L. R. A., 706; Roysdon v. Terry, 4 Tenn. App., 638, 653. While we do not agree with the chancellor that the policy upon its face included the accidents in question, we affirm his award of the recovery upon the reformation of the policy.

The complainant city appealed from the denial of a penalty, and in its behalf it is insisted that a penalty should have been imposed. In view of the failure of the policy to cover, on its face, the place of the accident, and of the uncertainty of the city as to its right to recover, as manifested by its delay, in applying for a reformation of the policy; and in view of the lack of evidence that the officers of the insuring company knew of the agreement made by its agents, we cannot conclude that the defendant's refusal to pay was made in bad faith.

The chancellor allowed interest on the amounts paid by the city from the date of the filing of the original bill. Counsel agreed that interest from the dates of payments by the city would increase the amount of interest by $1,000. In behalf of the city it is insisted that it is entitled to interest from the dates when the payments were made. This claim must be sustained. The allowance of interest was not discretionary. It was imperative under Shannon's Code, section 3494, as follows:

"All bills single, bonds, notes, bills of exchange, and liquidated and settled accounts, signed by the debtor, shall bear interest from the time they become due, unless it is expressed that interest is not to accrue until a specific time therein mentioned."

Insurance contracts come under this section of the Code. People's Bank & Trust Co. v. U. S. F. & G. Co., 156 Tenn., 517, 521, 3 S. W. (2d), 163.

The decree of the chancery court is affirmed, with the modification that the amount awarded is increased by the sum of $1,000. A decree will be entered in this court in favor of the City of Lawrenceburg against the Maryland Casualty Company and the surety on its appeal bond for the sum of $10,074.75, with interest from the date of the decree in the chancery court, and all costs of this cause.

Faw, P. J., and Crownover, J., concur.