FILED
06/21/2018
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
April 19, 2018 Session

**GILLIS ELLIOTT v. MIKE ROBBINS, ET AL.**

**Appeal from the Chancery Court for Claiborne County**
No. 18340    Elizabeth C. Asbury, Chancellor

_____

**No. E2017-01440-COA-R3-CV**
_____

This appeal arises from an action where the plaintiff sought to reform a deed that did not transfer a disputed acre of property to him.  The plaintiff alleged that a mutual mistake had occurred and that both plaintiff and defendants had intended for the disputed acre to be sold.  The trial court held that the mutual mistake existed and that the error was clear and convincing enough to allow for reformation of the deed.  The defendants appeal. We affirm the decision of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
Affirmed; Case Remanded**

JOHN W. MCCLARTY, J., delivered the opinion of the court, in which D. MICHAEL SWINEY, C.J., and THOMAS R. FRIERSON, II, J., joined.

Phillip L. Boyd, Rogersville, Tennessee, for the appellant, Mike Robbins.

Treva Robbins, New Tazewell, Tennessee, pro se appellant.

Brennan M. Wingerter, Knoxville, Tennessee, and Lee Dan Stone III, Tazewell, Tennessee, for the appellee, Gillis Elliott.

**OPINION**

**I.    BACKGROUND**

Mike Robbins ("Mr. Robbins") and Treva Robbins ("Ms. Robbins") jointly owned 32.7 acres of real estate at 179 Hatfield Lane in Tazewell, Tennessee (the "Property") from September 18, 1996, to May 23, 2013.  Mr. Robbins and Ms. Robbins (collectively "Sellers") purchased the Property from Tilmon and Kathleen D. Hatfield in two separate transactions on September 18, 1996.  The initial 31.7 acres were purchased for $8,828,

and a separate acre was bought for $46,172. Both pieces of land were separately deeded to Sellers and originally considered distinct properties by the Claiborne County Assessor of Property. The couple built a new residence on the 31.7 acres, while a well and a mobile home unsuitable for living remained on the single acre. A Claiborne County tax map included both plats of land as a single, combined tract. In a 2007 application to reduce their tax burden, Sellers stated their Property as a combined 32.7 acres. After a fire destroyed the couple's new home. Mr. Robbins and Ms. Robbins did not rebuild on the Property and later lived elsewhere. Mr. Robbins filed a complaint for divorce against Ms. Robbins in November 2012. The divorce complaint stated that they owned "33 acres" together and did not distinguish the two pieces of land. Ms. Robbins admitted the "33 acres" statement was true in her answer to the divorce complaint.

As the divorce proceedings continued, Sellers sought to sell the Property. Their son had been jailed on a charge of statutory rape, and the sale of the Property would fund his $50,000 bond and pay out additional judgment liens and delinquent taxes. Mr. Robbins asked his neighbor Boyd Mason ("Mr. Mason") about finding someone who would buy the Property. Mr. Mason told Mr. Robbins that Gillis Elliott ("Mr. Elliott") once said that he wanted to buy the Property if it ever became available. After Mr. Robbins and Mr. Mason went to Mr. Elliott's home to inform him that the Property was available to purchase, the three men then drove to the Property and examined it. Mr. Robbins and Mr. Elliott went to the highest point of the Property so Mr. Robbins could show Mr. Elliott its boundaries. Mr. Elliott asked where the septic tank and well were located, to which Mr. Robbins replied that the septic tank was at the front of the house and the well was near the old trailer at the bottom of the hill. As Mr. Robbins described the Property to Mr. Elliott, it ran from "from the road to the river," beginning along Harbor Road in Claiborne County and widening as it moved north with its wooded border along the Powell River. Mr. Elliott learned that a 10-foot right of way existed that connected to a neighbor's property and that the Property line was fenced along the Powell River. Mr. Mason testified that he heard Mr. Robbins tell Mr. Elliott that the Property ran mostly "from the road to the river." No mention was made of a separate acre or an offset during the conversation between Mr. Robbins and Mr. Elliott, even when they discussed the well located on the disputed acre. A fence surrounded by overgrown plants was in place near the disputed acre, but the fence covered more than the entire acre and could not be clearly seen by Mr. Elliott as he examined the Property. Mr. Elliott showed interest in buying the Property, which he believed included the 32.7 acres on both plats.

Mr. Robbins testified at trial that he was willing to sell if Mr. Elliott would deed him some of the wooded acres in the back of the Property once his son's legal troubles ended in the future. However, Mr. Robbins' claim was denied by Mr. Elliott, not referenced in the trial court's ruling, and not argued by any party on appeal. No written agreement was drafted to memorialize the parties' discussion, which Mr. Elliott said was not unusual for him and the way he had previously purchased real estate. Subsequent to

the discussions, Mr. Elliott posted as bond a separate home that he owned in order to gain the release of Mr. Robbins's son from jail.

Before the sale was closed, Mr. Elliott began work to improve the Property. Mr. Elliott hired two of Mr. Robbins's sons to help him with the improvements, some of which occurred on the disputed acre. Mr. Robbins's sons did not discuss the status of the disputed acre with Mr. Elliott at that time. During this period, Mr. Elliott also asked James Estep III, the attorney handling the sale, to conduct a title search of the Property. A title opinion dated May 22, 2013, related that the land consisted of 31.7 acres. The Property was not formally surveyed before closing, and Mr. Elliott did not examine prior surveys before the sale. On May 23, 2013, Mr. Elliott purchased the Property from Sellers for $60,000. The land deeded to Mr. Elliott included the 31.7 acres that Sellers received from the Hatfields in September 18, 1996. The deed did not include the separate, disputed acre purchased separately by Sellers. Mr. Elliott said that he did not know the exact acreage of the Property when he purchased it and did not read the deed before or during the closing. When describing the Property, the deed referenced both the original deed of 31.7 acres and the tax map that stated the Property was 32.7 acres. Three months later, Sellers completed their divorce agreement. The agreement did not reference or distribute the disputed acre to either party.

As the new owner, Mr. Elliott continued work on the disputed acre, which included building a well house, clearing the land, and graveling the road on the disputed acre. Mr. Elliott also built a new residence using the basement of the house that was destroyed by the fire. Two of Mr. Robbins's sons continued to help Mr. Elliott with his work. Mr. Elliott believed that the 32.7 acres belonged entirely to him until he learned about Mr. Robbins's claim. Mr. Elliott confirmed through tax records that a second deed existed for the disputed acre. Sellers later claimed that they had reserved the disputed acre as their son's inheritance. Sometime after this development, Mr. Robbins, his son, and a distant relative returned to the Property and erected a fence around the disputed acre using posts and white rope. Mr. Elliott later tore the fence down and continued to build on the disputed acre. Upon learning about the second deed, Mr. Elliott went to Ms. Robbins's residence and offered to pay her $2,000 to sign a quitclaim deed and transfer her interest in the disputed acre to him. Ms. Robbins refused to sign the deed after learning that Mr. Robbins would give her $3,000 not to sign document. After hearing this, Mr. Elliott told Ms. Robbins that he would "see [her] in court."

On September 18, 2014, Mr. Elliott filed a complaint against Sellers to establish ownership of the disputed acre. Initially, Mr. Elliott alleged that Sellers misrepresented the Property boundaries to him and that Mr. Elliott relied on their misrepresentations to purchase the land. As relief, Mr. Elliott requested that the disputed acre be divested from Sellers and vested in him through a quitclaim deed. Mr. Elliott moved for a default judgment after Sellers failed to provide a timely answer, but Sellers were granted a time extension to draft and file a response. In an answer, Mr. Robbins stated that the disputed

acre was never intended to be sold with the other parts of the Property. Mr. Robbins further stated that any oral agreement to transfer the entire Property was not written down and therefore unenforceable through the Statute of Frauds. Mr. Robbins denied any representation was made to Mr. Elliott about the boundaries of the disputed acre and claimed that a title search could easily determine the existence of the separate deed concerning the acre.

On March 10, 2015, Mr. Elliott filed a motion to amend his complaint to include allegations of mutual mistake and fraud concerning the description of the Property by Sellers. After the trial court granted the motion, Mr. Robbins filed a motion for summary judgment alleging that an oral agreement occurred which was barred by the Statute of Frauds. Mr. Elliott subsequently responded, stating that the two pieces of land were combined into the single Property by the tax assessor's office and that the deed was given in error through mutual mistake or fraudulent misrepresentations. On November 6, 2015, Mr. Robbins filed a counter-complaint that alleged that the oral agreement included a transfer of five acres from Mr. Elliott to Mr. Robbins upon the conclusion of the legal matters of Mr. Robbins's son. Mr. Robbins accused Mr. Elliott of abandoning the agreement and requested that the five acres be deeded to him as relief. Mr. Elliott denied the allegations and moved to dismiss the counter-complaint in a separate answer. Mr. Robbins filed an answer to Mr. Elliott's amended complaint in which he denied intending to convey the disputed acre until he received the five acres from Mr. Elliott.

The trial was held on May 23, 2017. After Mr. Elliott's argument, the trial court denied Mr. Robbins' "motion to dismiss," which both parties later considered as a motion for a directed verdict. After all parties' arguments were made, the court found a mutual mistake had occurred and entered a judgment in favor of Mr. Elliott. The trial court found through clear and convincing evidence that both parties believed that the Property included the 32.7 acres. Once the mistake occurred, the court concluded that Mr. Robbins "took advantage of that" to try to get greater value out of the situation. The trial court held that the deed transferring the Property from Sellers to Mr. Elliott should be reformed to include the disputed acre. A written order was later filed on June 20, 2017. This timely appeal followed.

## II.   ISSUES

We consolidate and restate the issues raised on appeal by defendants as follows:

1.   Whether the trial court erred in reforming a deed based on mutual mistake or fraud when Sellers sold the Property to Mr. Elliott without discussing the disputed land and did not raise the property dispute until months after the sale.

2.     Whether the trial court erred in denying a motion for summary judgment and a motion to dismiss when Mr. Elliott argued against both motions and the court decided the case on its merits.

## III.     STANDARD OF REVIEW

An appellate court shall review findings of fact in civil, non-jury actions on a de novo basis. Tenn. R. App. P. 13(d). Unless the preponderance of the evidence suggests otherwise, a review of the findings of fact shall be accompanied by a presumption of correctness. *Id.* Questions of law in civil actions are also reviewed through a de novo standard, "according no deference to the conclusions of law made by the lower courts." *S. Constructors, Inc. v. Loudon Cty. Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001). A trial court's assessment of the credibility of a witness shall not be re-evaluated unless contrary evidence is clear and convincing. *Wells v. Tennessee Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

## IV.     DISCUSSION

## <u>Mutual Mistake</u>

Courts must interpret contracts and deeds as written and cannot draft new contracts for parties who have already written one. *Sikora v. Vanderploeg*, 212 S.W.3d 277, 286 (Tenn. Ct. App. 2006). However, a court may reform or correct a mistake in an agreement "so that it fully and accurately reflects the agreement of the parties." *Lane v. Spriggs*, 71 S.W.3d 286, 289 (Tenn. Ct. App. 2001*)*; *see also Lebo v. Green*, 426 S.W.2d 489, 494 (Tenn. 1968). A chancery court may reform and correct errors in a deed when the errors were made by mutual mistake or unilateral fraud. *Wallace v. Chase*, No. W1999-01987-COA-R3-CV, 2001 WL 394872 at *3 (Tenn. Ct. App., Apr. 17, 2001). A mistake occurs when an action would not have happened but for "ignorance, forgetfulness, advertence, mental incompetence, surprise, misplaced confidence, or imposition…." *Town of McMinnville v. Rhea*, 316 S.W.2d 46, 50 (Tenn. Ct. App. 1958). The doctrine of reformation is only appropriate when the intent of both parties is clear and the same. *Hunt v. Twisdale*, No. M2006-01870-COA-R3-CV, 2007 WL 2827051, at *8 (Tenn. Ct. App., Sept. 28, 2007). "Because the law strongly favors the validity of written instruments, a person seeking to reform a written contract must do more than prove a mistake by the preponderance of evidence…. the evidence of mistake must be clear and convincing." *Sikora*, 212 S.W.3d at 287. A mistake can occur through the expression of an agreement, or when one or both parties falsely believe that the signed contract reflects a previously-made agreement. *Chandler v. Charleston Volunteer Fire Dep't.*, No. W2011-00322-COA-R3-CV, 2011 WL 4026844 at *4 (Tenn. Ct. App., Sep. 13, 2011); *Sikora*, 212 S.W.3d at 287. To reform an agreement because of mistaken expression, a party must present clear and convincing evidence that proves:

(1)   the parties reached a prior agreement regarding some aspect of the bargain;

(2)   they intended the prior agreement to be included in the written contract;

(3)   the written contract materially differs from the prior agreement; and

(4)   the variation between the prior agreement and the written contract is not the result of gross negligence on the part of the party seeking reformation.

*Sikora*, 212 S.W.3d at 287-88. Gross negligence can occur when a party's mistake happens through a failure to act in good faith or without reasonable standards of fair dealing. *Id.*, 212 S.W.3d at 290; *see also Payne v. First Cmty. Bank (In re Payne)*, 523 B.R. 560, 574 (Bankr. E.D. Tenn. 2014) ("[I]nattention alone will not defeat the [plaintiff's] argument."). A failure to find a drafting error does not prevent reformation. *Rentenbach Eng'g Co., Constr. Div. v. Gen. Realty Ltd.*, 707 S.W.2d 524, 527-28 (Tenn. Ct. App. 1985). One party's denial of the existence of an agreement or a mistake does not automatically bar the reformation of a contract. *Sikora*, 212 S.W.3d at 288; *Chandler*, 2011 WL 4026844 at *4.

In the present case, the parties' initial discussions and later actions indicate that an agreement existed that differed from the final transaction. According to the trial court's findings, Mr. Robbins generally described the Property to Mr. Elliott and did not mention the disputed acre in their conversation. While a fence existed on the Property, it did not surround the disputed acre in a way that clearly separated it from the rest of the land. Before the Property closed, Mr. Elliott began making improvements on the land, including on the disputed acre. Two of Mr. Robbins's sons also worked for Mr. Elliott on the Property and never mentioned the disputed acre directly to Mr. Elliott. Later that year, Sellers failed to mention or divest the disputed acre when completing their divorce. When Mr. Elliott attempted to give $2,000 to Ms. Robbins to quitclaim her interest in the disputed acre, she declined after Mr. Robbins offered to pay her $3,000 not to sign the deed. For these reasons, the trial court found not only that both parties had intended to sell the disputed acre, but also that Mr. Robbins attempted to take advantage of the situation and obtain more money or land to give up the claim for the disputed acre. No clear and convincing evidence is present to question the trial court's assessment of Mr. Robbins's credibility, and this court should consider that assessment when evaluating these factors. The lack of specificity in describing the Property and lack of an objection to the development of the disputed acre are sufficient to show that an initial agreement existed to grant the entire 32.7 acres to Mr. Elliott.

The actions following the sale of the Property, including further development of the land, Sellers' failure to address the disputed acre in the divorce, and the effort to prevent the land from being quitclaimed, indicate that the parties intended the full 32.7 acres to be sold as described in the initial agreement. The final agreement as outlined in the deed did not transfer the entire Property to Mr. Elliott and is materially different from the initial agreement. At the time of the sale, the parties appeared to act in good faith toward each other and completed the sale with an apparently inadvertent mistake. *See generally In re Payne*, 523 B.R. at 574 (holding that mistakes are not the result of gross negligence when "there was no evidence to suggest the errors were anything other than inadvertent"); *Sikora*, 212 S.W.3d at 290. Although the error occurred through the understanding of the deed, the failure to find the error does not itself constitute gross negligence. Without the presence of gross negligence, the difference between the initial agreement and final deed is sufficient to establish a mutual mistake and allow the deed to be reformed as ordered by the trial court. Because a mutual mistake exists, this court has no need to evaluate Mr. Elliott's claim of unilateral fraud in the present case.

Sellers argued that Mr. Elliott failed to prove that any mistake in the present case was mutual, whether through clear and convincing evidence or otherwise. To prove a mutual mistake occurred that allows for reformation, a party must present clear and convincing evidence that the mistake occurred. *Sikora*, 212 S.W.3d at 287. Clear and convincing evidence must show that the facts asserted are highly likely to be true and that no serious or substantial doubt exists about the validity of the court's conclusions. *Teter v. Republic Parking Sys.*, 181 S.W.3d 330, 341 (Tenn. 2005) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901 n.3 (Tenn. 1992)). Based on the facts referenced above, the trial court did not err in finding clear and convincing evidence of a mutual mistake as necessary to alter the deed. By not acknowledging the disputed acre on the Property while discussing the sale with Mr. Elliott, Mr. Robbins gave no indication that the disputed acre would be held out from the sale. Neither Mr. Robbins nor Ms. Robbins claimed the Property when finalizing their divorce or paid taxes on the disputed acre after it was sold. The evidence showed that Sellers very likely intended to give the disputed acre to Mr. Elliott at the time of the sale. The court's findings provide no reason to doubt whether its conclusions were correct or not. Therefore, the trial court did not err in finding clear and convincing evidence of the mutual mistake and allowing the reformation to occur.

Alternatively, Sellers challenged the existence of a mutual mistake, arguing that the case law relied upon by the trial court only supports reformation when both parties acknowledge the mistake. While the parties in *Sipes* both admitted to mutual mistake, this court also described reformation through mutual mistake and fraud as "well settled law in this state." *Id.*, No. W2015-01239-COA-R3-CV, 2017 WL 417222 at *4, (Tenn. Ct. App., Jan. 31, 2017) (quoting *Bank of Am., Nat'l Ass'n v. Meyer*, No. M2014-01123-COA-R3-CV, 2015 WL 1275394, at *3 (Tenn. Ct. App., Mar. 17, 2015)). The law described by *Sipes* and *Bank of America* cites many of the cases addressed above and

states that reformation is appropriate when mutual mistake exists and the intent of both parties is clear and the same. *See Wallace*, 2001 WL 394872 at *3; *Hunt v. Twisdale*, 2007 WL 2827051, at *8. However, the case law also provides that reformation can occur even when one party denies that an agreement existed or that a mistake occurred. *Sikora*, 212 S.W.3d at 288. Thus, even though the facts in *Sipes* differ from the present case, the law cited by the court's opinion does not. The trial court did not err in using the case in its reasoning.

Additionally, Sellers argued that mutual mistake and fraud did not occur because Mr. Elliott admitted to not reading the deed before closing the sale of the Property. In doing so, Sellers referenced a case recently decided by this court that found no mutual mistake when "the signors did not appreciate all the implications of a life estate" inserted into a quitclaim deed. *Stokely v. Stokely*, No. E2017-00433-COA-R3-CV, 2018 WL 485998 at *6 (Tenn. Ct. App., Jan. 19, 2018). In that case, the appellants sought relief after granting a life estate to a relative without fully understanding the effects of the grant. *Id.*, 2018 WL 485998 at *2. This court affirmed the ruling of the trial court, which held that the deed could not be reformed when the signors were mistaken about the implications of creating a life estate. *Id.*, 2018 WL 485998 at *6. In the present case, the parties' signed the agreement with the correct understanding of what it would do, but with a mistaken belief of what it would affect. The parties here knew that the deed would transfer ownership of the Property, but mistakenly believed that the deed covered 32.7 acres instead of the 31.7 acres it described. Whether Mr. Elliott read the deed or not, his mistake was rooted in his reliance on the land description given to him by Mr. Robbins when they first discussed selling the Property. Unlike the facts presented in *Stokely*, the mistake occurred here because of the parties' understanding of what was part of the Property, not what the deed itself would accomplish. Because of this, the mutual mistake would still serve as a valid reason to reform the deed, as held by the trial court.

Further, Sellers challenged whether the reformation of the deed is a valid remedy for mutual mistake when Mr. Elliott prayed for the trial court to divest Sellers' interest in the disputed acre to him in the original complaint. Sellers argued the trial court erroneously applied the remedy when it was not properly pleaded under Rule 8 of the Tennessee Rules of Civil Procedure. *See generally Jasper Engine and Transmission Exchange v. Mills*, 911 S.W.2d 719, 720 (Tenn. Ct. App. 1995). In *Jasper Engine*, a petition for a writ of certiorari failed to include sufficient facts to be considered by a court, even when "coupled with the conclusory allegation that mutual mistakes have been made." *Id*. However, a pleading is only required to contain a "short and plain statement of the claim showing that the pleader is entitled to relief" and a separate "demand for judgment for relief the plaintiff seeks." Tenn. R. Civ. P. 8.01. Further, courts have considered reformation to be a valid remedy when judges are seeking to determine the ownership of certain real estate. *See Kramer v. Coleman*, No. 03A01-9601-CH-00033, 1996 WL 283065 at *2 (Tenn. Ct. App., May 30, 1996); *see also Continental Land. Co. v. Investment Props. Co.*, No. M1998-00431-COA-R3-CV, 1999 WL 1129025 at *8

(Tenn. Ct. App., Dec. 10, 1999). In the present case, Mr. Elliott's amended complaint alleged that mutual mistake occurred based on the facts stated in the original complaint. Further, Mr. Elliott requested and received approval from the court to alter the complaint to include the mutual mistake claim. *See* Tenn. R. Civ. P. 15.01. While Mr. Elliott wanted to establish ownership of the Property through divestment, the court did not err in using reformation as the remedy to establish Mr. Elliott's ownership through mutual mistake. Whether as reformation or divestment, the trial court's order to declare Mr. Elliott as the owner of the disputed acre provided sufficient relief as requested in the amended complaint.

## Statute of Frauds

Sellers argued that any agreement that would grant Mr. Elliott the disputed acre would be invalid through the Statute of Frauds. In Tennessee, an oral contract for the sale of land is invalid unless the agreement or promise was later made in writing by the parties involved in the sale. Tenn. Code Ann. § 29-2-101(a)(4). The deed that should be reformed based on mistake, however, does not disturb the Statute of Frauds. *See Lane,* 71 S.W.3d at 291; *see also First Nat'l Bank v. Ashby*, 2 Tenn. App. 666, 669 (Tenn. Ct. App. 1925). Parol evidence can be admitted when determining whether a mistake occurred in the formation of a contract. *Rentenbach Eng'g Co., Constr. Div.*, 707 S.W.2d at 527; *see also Textron Fin. Corp. v. Powell*, No. M2001-02588-COA-R3-CV, 2002 WL 31249913 at *5 (Tenn. Ct. App., Oct. 8, 2002) ("When parol evidence is offered not to vary or disavow the terms of the contract, but to show an alleged fraud or mistake, this Court is hesitant to exclude the evidence."). In the present case, the presence of a mutual mistake would allow the deed to be reformed without invoking the Statute of Frauds. Further, the parol evidence would be admitted when evaluating the written deed and the potential mistake written in it, not the conversation and oral agreement that Mr. Elliott and Mr. Robbins discussed at the Hatfield Lane property. *See Rentenbach Eng'g Co., Const. Div.*, 707 S.W.2d at 526-27; *City of Lawrenceburg v. Maryland Cas. Co.*, 64 S.W.2d 69, 73-74 (Tenn. Ct. App. 1933). The trial court did not err by not imposing the Statute of Frauds in the present case.

## Pre-trial Motions

Finally, this court must determine whether this trial court was correct in denying Mr. Robbins's two motions before the case was decided on its merits. On their faces, the motions separately requested summary judgment and a directed verdict, though the directed verdict motion was described as a "motion to dismiss." An appellate court may not revisit a motion for summary judgment when its denial was based on a genuine issue of material fact and the case was eventually decided on its merits. *Tate v. Monroe Cnty.*, 578 S.W.2d 642, 644 (Tenn. Ct. App. 1978). Motions for directed verdicts also face limited appellate review after the completion of a trial. *Id.*, *see also Mullins v. Precision Rubber Prods. Corp.*, 671 S.W.2d 496, 498 (Tenn. Ct. App. 1984). Here, Mr. Elliott

sufficiently pleaded allegations of mutual mistake and fraud and presented a sufficient issue of material fact that required a trial court to judge the case on its merits. The trial court was correct in denying both motions and allowing the case to continue.

## V.    CONCLUSION

The judgment of the trial court is affirmed, and the case is remanded for further proceedings as necessary. Costs of the appeal are taxed to appellants, Mike Robbins and Treva Robbins.

_____
JOHN W. MCCLARTY, JUDGE