WILLIE HENRY and LEE SAIN, Individually and as Partners, D/B/A Henry & Sain, Appellants, v. SOUTHERN FIRE & CASUALTY COMPANY, Appellee. —330 S. W. (2d) 18.

Western Section. September 24, 1958.

Rehearing denied October 2, 1959.

Certiorari Denied by Supreme Court September 3, 1959.

336

Thomas R. Prewitt, Memphis, Alan M. Prewitt, Bolivar, for appellants.

Moss & Benton, Jackson, for appellee.

CARNEY, J.   Complainants, Willie Henry and Lee Sain, appeal from the action of the Chancellor below in withdrawing the issues of fact from the jury upon the completion of the evidence and rendering a decree in favor of the defendant below, Southern Fire and Casualty Company.

Complainants, residents of Hardeman County, Tennessee, are engaged in the timber business. Their operation includes buying standing timber, cutting the trees, hauling the logs to their sawmill, sawing the logs into lumber and selling the lumber.

The complainants have been in the timber business for the past eighteen years and they operate in several counties in West Tennessee. Whenever they buy a tract of standing timber they move all their equipment including their sawmill onto or as near the timber tract as possible. If the tract is a large one, they often move the sawmill from one part of the tract to another to shorten the distance the logs have to be hauled from the stump to the sawmill.

It is further their custom to haul the logs from the stump to the sawmill on four wheel rubber-tired trailers pulled by mules or horses. The sawed lumber, either rough or dressed, is then hauled by truck from the sawmill to various lumber yards where it is stored for sale.

After all the timber is removed from a particular tract the sawmill and all the logging equipment are then moved to another tract. The distance the sawmill has to be moved may be only a few miles or it may be 100 miles or more depending on the location of the next tract of timber to be cut.

It is the custom of the complainants whenever the sawmill and logging equipment are to be moved a distance of more than ten miles to dismantle the sawmill and load it onto the trucks and onto the trailers and to pull the log trailers behind the trucks over the highway to the new location. If the distance is less than ten miles the complainants sometimes tow the trailers by truck and sometimes pull them with teams to the new location depending on the particular circumstances.

On June 21, 1956, while the complainants were in the process of moving their sawmill and logging equipment to a new location, a distance of 40 miles, one of the complainants' trucks loaded with sawmill equipment was pulling a rubber-tired log trailer also loaded with sawmill equipment along State Highway No. 18 north of Bolivar in Hardeman County, Tennessee. The trailer was attached to the truck by a chain and in some manner pulled loose from the truck, crashed across the highway into an oncoming vehicle, killed one person, injured others and caused considerable property damage.

All of complainants' trucks and automobiles were covered by liability insurance under a fleet policy issued by the defendant, Southern Fire and Casualty Company. The defendant, Southern Fire and Casualty Company, denied liability under the policy on the grounds that the trailer was not described in the policy.

After a disclaimer of coverage by the defendant, complainants, through their own counsel, settled all the claims and suits growing out of the accident in the total amount of $12,273.65. This sum includes court costs, expenses and attorneys fees in the amount of $1,200. No question is made as to the reasonableness of the settlements nor the amount of the expenses.

At the time of the accident on June 21, 1956, the complainants held three separate policies of insurance issued by the defendant, Southern Fire and Casualty Company, through its agent in Bolivar, Tennessee, Dr. Walter W. Cox:

I. Standard Workmen's Compensation and Employers' Liability Policy which protected complainants against liability to their several employees.

II. A Combination Policy which covered two personal automobiles and four trucks owned by the complainants. This policy was issued in the name of Lee Sain and Willie Henry, d/b/a Henry & Sain, and gave their occupation as "Farmers and loggers and lumbermen."

Under the title "Exclusions" the policy provides as follows:

"This policy does not apply:

"(c) Under coverages A and B, while the automobile is used for the towing of any trailer owned or hired by the insured and not covered by like insurance in the Company, or while any trailer covered by this policy is used with any automobile owned or hired by the insured and not covered by like insurance in the Company."

III. A Manufacturers' and Contractors' Liability Policy which indemnified the complainants against liability for claims for personal injuries and property damages arising out of the operation of the sawmill.

From the portion of the policy entitled "Declarations" we quote as follows:

"Item 1. Named Insured     Lee Sain and Willie Henry
                                      d/b/a Henry & Sain

Address                  Bolivar, Hardeman County, Tennessee

Location of all premises owned, rented or controlled by named insured

Moscow, Tennessee"

From Item 4 of the policy entitled "Description of Hazards" we quote as follows:

"1. Premises—Operations

Moscow, Tennessee

Logging and Lumbering—including construction and extension of logging railroads and the ownership, maintenance and use of teams—(Mill Operations and Maintenance and operations of logging railroads to be separately rated).     2702

Saw Mills—(commercial lumber yards to be separately rated).     2464

Lumber Yards—no second-hand materials— including local managers.     2387"

Under the title "Exclusions" liability for accidents occurring in the operation of automobiles is expressly excluded as follows:

"This policy does not apply:

"(a) Under division 1 of the Definition of Hazards and under coverage C, to the ownership, maintenance, operation, use, loading or unloading of * * *.

"(2) Automobiles if the accident occurs away from such premises or the ways immediately adjoining, * * *."

None of the log trailers were listed in any of the insurance policies.

Complainants' bill against the defendant to recover the costs of settlement, fees, etc. totalling $12,273.65 was brought on the following theories:

(1) That claims arising out of said accident were covered by the terms of one or more of said policies;

(2) That said Combination Automobile Policy should be reformed so as to provide coverage for claims growing out of said accident; and

(3) That defendant, through its agent, Dr. Walter W. Cox, of Bolivar, was negligent in failing to provide coverage or protection to complainants while their trailers were being used on the open road under the circumstances obtaining at the time of said accident.

The defendant, in its answer, admitted the issuance of the three policies referred to in the complainants' bill but denied that its local agent, Dr. W. W. Cox, ever agreed to issue any kind of insurance which would provide full liability protection for complainants' entire business operations but insisted that its liability was limited to the terms and conditions of the three policies actually issued to the complainants by said agent.

Further, the defendant's answer averred that its local agent was never informed by the complainants that the log trailers were to be insured; that the defendant was never given any description of or information concerning such trailers and never afforded the opportunity to decide whether or not it would or could insure them.

Further, the defendant set out in its answer that the local agent, Dr. W. W. Cox, at Bolivar did not have authority under his agency contract with defendant to insure the log trailers or to insure complainants' liability resulting from the operation of said trailers, without first submitting to the home office of the defendant information as to the length and general condition of the trailers and other data relating to the insurability of such vehicles.

Complainants both testified in their behalf and also introduced several witnesses. The defendant offered only the deposition of Dr. W. W. Cox who was ill at the time of the trial and died shortly thereafter.

Prior to the conclusion of all the proof the complainants had prepared and filed with the court the following issues of fact to be submitted to the jury:

"1. At the time the three insurance policies were issued to Henry & Sain, did Dr. W. W. Cox, assure them that he was familiar with their business operations and that he knew of the types of insurance which they needed for full liability protection?

"2. Did Dr. Cox know or in the exercise of reasonable care as an experienced insurance agent should he have known that Henry and Sain used log trailers in their business and customarily used such trailers on public highways in transferring their mill operation from one mill site to another?

"3. Did Henry & Sain, on or before taking out all three of the policies in question, tell Dr. Cox that they wanted full liability insurance to protect them in the usual operation of their lumber business?

"4. Did Dr. Cox assure Henry & Sain that the three policies would give them full protection in the usual operation of their lumbering business?

"5. Was it the intention of Henry & Sain that the insurance policies issued by Dr. Cox after 1950 cover its entire lumbering operation, including that operation wherein trailers were used on the public highways in transferring from one mill site to another?

"6. Was the failure of Dr. Cox to provide coverage to Henry & Sain for that operation when trailers were used on the highways in transferring from one mill site to another caused by a mistake on the part of Dr. Cox or by Dr. Cox's failure to use reasonable care in carrying out the wishes of Henry & Sain?"

At the conclusion of all the proof the Chancellor sustained a motion by the defendant to withdraw the issues from the jury and rendered judgment dismissing complainants' bill.

The Chancellor found that the complainants did have confidence in Dr. Cox; that they considered him an authority on insurance; that they never read their insurance policies or asked advice from Dr. Cox or anyone else as to their coverage; that they relied upon him to give them full protection on all of their operations. The Chancellor then went further and found that the complainants never actually informed the agent, Dr. Cox, that when moving from one mill site to another, it was their custom to hitch their log trailers to trucks and pull them over the open road and the court further found that the said agent was never requested by complainants or either of them, to make any reference to the trailers

in their motor vehicle policy and that Dr. Cox did not know that the complainants wanted their trailers insured, or their trucks insured when pulling trailers; and that the complainants never informed Dr. Cox that their trailers would be used anywhere except in the woods with teams and that therefore Dr. Cox wrote all of complainants' policies as he intended and that there was no mistake on his part.

The Chancellor held that since there was no mutual mistake and no allegation or proof of fraud on the part of Dr. Cox the contract of insurance should not be reformed.

On the complainants' theory of negligence the Chancellor had this to say:

"Mistake is, of course, distinguished from inattention or absence of thought, which are inherent in negligence. The Court finds no basis in the proof for sustaining the bill on the alternative theory of negligence,—which rests on the averment that defendant's agent knew, or ought to have known, complainants' system of operations, and that their trucks would tow their trailers on the highways occasionally when moving from one work site to another. If it can be said that the agent was negligent, is not the contributory negligence of the complainants more clearly established? For they carried their insurance with defendant for about ten years, advising the agent from time to time about the trucks and cars they wished insured, and never telling him about the occasional use of their trailers on the highway or requesting that this feature of their operations be insured.

## "V.

"Complainants' case seems to rest in the final analysis entirely upon their request for defendant's agent to insure 'all their operations' and their assumption that he knew all about their operations, or enough to insure them against loss by every conceivable hazard. To sustain this contention would seem to the Court to involve some radical changes in the law of contracts—insurance or otherwise—and to set a rather dangerous precedent—one which this Court is not inclined to establish."

Complainants have filed nine assignments of error, eight of which are directed at the action of the court in withdrawing the issues from the jury and dismissing the complainants' bill. One assignment relates to exclusion of evidence.

Prior to 1950 the complainants did not own or operate the sawmill but they bought and cut standing timber, hauled the logs to the sawmill owned by Mr. A. N. Hall, then hauled the sawed lumber to lumber yards for sale. In 1950 complainants bought Mr. Hall's sawmill, equipment and machinery and thereafter the entire lumber operation was owned by the complainants.

Complainants testified that in 1946 and for several years prior thereto they had been operating their timber business without any liability insurance. In the year 1946 one of their trucks fell through a bridge, two employees were killed, and the complainants were required to pay out of their own funds considerable money in order to settle the claims for the deaths of these two employees.

Complainants testified that this unfortunate accident in 1946 impressed upon them the importance of having adequate liability coverage and, accordingly, they consulted Dr. Walter W. Cox of Bolivar, Tennessee, local agent for the defendant, Southern Fire and Casualty Company, about their insurance needs.

Dr. Cox thereupon issued to them two separate policies: A Workmen's Compensation and Employers' Liability Policy and A Motor Vehicle Policy. The complainants operated under these two policies, paying annual premiums thereon, until they bought out Hall in 1950. Upon buying the sawmill equipment from Mr. Hall in 1950 they immediately reported this fact to Dr. Cox.

The testimony of the complainant, Sain, in this regard is as follows:

"Q. 55. And what did you tell Dr. Cox when you went in after you had bought out Mr. Hall? A. Well, we told him that we had bought Mr. Hall out, and we wanted coverage—if we didn't have, we wanted coverage on all of our equipment and whatever we were doing and where, any location, whether in Hardeman County or Madison or anywhere, we wanted full coverage.

"Q. 56. And did Dr. Cox, or not, assure you that he could provide that coverage for you? A. Yes, sir.

"Q. 57. And that was in 1950, you say? A. Yes." (Tr. pp. 128-129.)

On this occasion when the complainants reported to him the purchase of the sawmill equipment from Hall,

Dr. Cox executed and delivered to them the third policy entitled "A Manufacturers' and Contractors' Liability Policy." The complainants testified that they operated from 1950 up until the time of the accident in 1956 under the belief that these three separate policies issued to them by Dr. Cox gave them full and complete liability coverage on all of their usual lumbering operations.

They admitted that they never in so many words told Dr. Cox that it was a part of their custom and the custom of timber men in general to transfer the rubber-tired log trailers from one location to another location by towing the same behind a truck where the distance between sites was more than ten miles. It is their insistence that Dr. Cox knew that they owned and operated the trailers in their lumbering business; that he knew that when one tract of timber was cut out they had to move the logging and timbering equipment including the trailers from one site to another; and that the custom of towing the trailers loaded with sawmill equipment from one site to another was so general in Hardeman County and that area of West Tennessee that Dr. Cox was chargeable with notice of such practice and that they were justified in assuming that Dr. Cox did know of such custom especially in view of the fact that he asked no questions indicating a lack of knowledge of such custom and in view of the fact that he assured them that he was fully familiar with their logging operations.

Three witnesses corroborated the testimony of the complainants that it was the custom in and around Hardeman County, Tennessee, to tow the log trailers over the road behind trucks in moving from one timbering site to another.

The complainant, Henry, testified that they never sought or ordered any particular type of policy from Dr. Cox on any particular property but that on the contrary, they told him they wanted full liability coverage on all of their operations and that they then relied upon him to issue to them the various policies necessary to give them full liability coverage and that they never read the policies but relied upon the assurance of Dr. Cox that they had full liability coverage.

Dr. Cox testified by deposition taken on June 8, 1957, before the trial was held on September 21, 1957, that he had been the local agent in Bolivar, Tennessee, for the defendant, Southern Fire and Casualty Company, since about 1940; that he had lived in Bolivar, Tennessee, since 1897; that he had been in the drug business for 35 years; later he was accountant at Western State Hospital in Bolivar, Tennessee, and then beginning in 1938 he was in the insurance business; that he had known the complainants since they were boys.

Dr. Cox denied that the complainants ever asked him to give them full liability coverage but the tenor of his deposition is that he merely wrote liability on the particular items of property which they sought to have covered.

That Dr. Cox knew that these complainants did own and use the log trailers in their business is definitely shown by the following quotations from his testimony:

"Q. 26. Now, Dr. Cox, did Henry and Sain, or either of them ever ask you to insure their trailers that they carried their logs on, or any kind of trailers? A. No, sir.

"Q. 27. Did they ever ask you to insure any of these vehicles that are insured, when pulling a trailer? A. No, sir.

"Q. 28. Did you ever discuss with them anything about their trailers? A. No; I asked them how they did their logging and they said with teams and they had log wagons, that Cisco out here had two or three wagons.

"Q. 29. Who is Cisco? A. He was an employee.

"Q. 30. Of Henry and Sain? A. That is right.

"Q. 31. Well, now, what do you mean by wagons—log wagons? A. It is a wagon, you know, with a—you know the kind of bolster they put on there to raise it a little higher than the ordinary wagon, you see, I mean—er—so they can load the logs on there. You know what I am talking about; you have seen them and they had rubber tires on these.

"Q. 32. Well, is it—is it similar to what we call a trailer, or not? A. No; no.

"Q. 33. Is it something pulled by horses or by a truck? A. It is pulled by horses.

"Q. 34. By horses. Well, now, I have interrupted you when I had asked you about what conversation, if any, you ever had with either of them about their trailers,—did you finish that, or not? A. I think so. They never said anything to me about the trailer, or any equipment that he—

"Q. 35. Well, you said you asked them how they did their logging? A. Yes, I asked them how they did their logging; they said, with teams. I sold them a

tract of timber down there last summer, down there off the levee, I believe it was last summer. You see, they would hire this man to take his teams with the wagons and haul the logs from the woods to the mill.

"Q. 36. You mean to the sawmill in the woods? A. Yes. That is right; they had the mill down in the bottom there.

"Q. 37. You mean to the sawmill in the woods? A. Yes, that is right, they had the mill down in the bottom in there.

"Q. 38. Did either of them ever at any time advise you that any of the automobiles or trucks which you were insuring would pull those wagons or trailers on the highway? A. No, sir.

"Q. 39. When did the conversation take place that you referred to when you asked them how they did their logging? A. When I wrote the policies.

"Q. 40. When you first wrote it, or later, or when? A. Yes, sir, and later. I think I asked them several times when we—when we were writing it up that policy.

"Q. 41. And of whom did you ask that? A. Well, Henry and Sain both came in the office each time they renewed it.

"Q. 42. They both came in? A. They both came in at the same time.

"Q. 43. Are you—do you know of your own knowledge the kind of trailer or log wagon, whatever you call it, that was involved in the death of somebody and this lawsuit? A. It was a regular log wagon

with rubber tires on it and it was fastened to a truck with log chains, and they were going down the levee, going north on 18 and a tire blew out, I think the right front tire—I figure the right front tire, and when they did that you know, with the load on there —it was loaded with machinery and that—

"Q. 44. What was the machinery loaded on? A. On the log wagon.

"Q. 45. On the log wagon? A. It wasn't on the truck at all.

"Q. 46. Well, finish, I interrupted you? A. And the chain, it was just tied, and the chain come untied—now, they said they had two log chains on there, that had been—

"Q. 47. Well, did you—I believe you told me before that you went to the scene of the accident? A. I was coming from Jackson that afternoon and as I approached the levee down there I saw a bunch of cars down there, and I set my car and parked it over there and went down there where they were; some fellow says, 'is that yours?' I says, 'it is one of my policy holders, anyway,' and we went down there. Now, I told, I believe it was—Lee Sain was down there then, was talking about it; I said, 'Lee, I am afraid this is not covered, you didn't have any insurance on your trailer;' I said 'you all come to the office in the morning and make me a report of this so I can send it to the Company',—send it to the adjuster in Memphis, Jack Franklin, and they did so. I made out the report and Jack was away at that time, and he told me any accident—

"Q. 48. Well, you needn't tell about the conversation with him. A. Yes.

"Q. 49. Now, they say in the bill filed in this case, Dr. Cox, that they asked you to cover or insure every phase of their operations, is that correct, or not? A. No, they—I told them to give me a list of what they wanted insured, and the list is what I covered. I could not have insured the wagon trailer, even if they had asked me to, because that couldn't have been covered.

"Q. 50. Why couldn't you have included it? A. Because it is excluded from commercial trucks; it can be used on farm trucks only. A farmer can—

"Q. 51. Now, you are talking about the kind of wagon trailer that is involved? A. That is right.

"Q. 52. That you saw at the scene? A. Oh yes, I saw it. A wagon trailer is covered—can be covered by a farmer if he is moving his products from the farm to town, like hauling cotton; he can attach a wagon to his trailer and that would be covered, but under—no machinery could be added at all on that, just farm products only.

"Q. 53. Now, was this particular trailer we are talking about and the log trailers, or log wagons, whichever you call them, were they designed to be attached to a tractor or truck,—I mean by that, did they have a hitch on it for that purpose? A. They probably had a hitch, but I don't know whether they —it wasn't used. They take—I reckon they just take the tongue out of the wagon, I don't know how they did that; they just tie it down there to the truck. I don't know whether they took the tongue out, or not.

"Q. 54. Did Henry and Sain ever ask you to make an inspection of their vehicles,—trailers or any other kind? A. No.

"Q. 55. Did you ever make such an inspection personally,—did you look them over? A. No, nothing only I have seen the cars, is all, but I have—I have seen the trucks but I didn't make any inspection.

"Q. 56. Well, did you, or not rely on what they told you about the vehicles? A. Absolutely.

"Q. 57. To be insured and to list them? A. We do that with all of them.

"Q. 58. Doctor, was it ever your—state whether or not it was ever your intention when writing and issuing these fleet policies, or any other policies to Henry and Sain to insure these trailers? A. No.

"Q. 59. The log trailers? A. No.

"Q. 60. Well, the bill they have filed in this case says that it was a mistake that you did not list them, is that true, or not? A. No, they didn't,—they didn't give them to me. I couldn't list anything that—I couldn't have listed them, if they had given them to me, not that kind of—not that kind of a trailer.

"Q. 61. They are not insurable? A. Not insurable under commercial trucks.

"Q. 62. Did you, or not, write for Henry and Sain the policies that you intended to write? A. Yes, sir.

"Q. 63. Do you know of any mistake you made in writing the policies, or any of them? A. I don't know of any. I give them the policies and they never—I went over the list with them and when the policies

came I gave them to them, and I told them any changes they made,—if they should have a change in the truck or a change in the car, to—we made a transfer on that, you know. * * * ''

Cross-Examination by Mr. Prewitt:

''Q. 37. Now, Doctor, as I understand it, when Mr. Henry and Mr. Sain first came in to see you, regardless of what date it was, that you were aware of the fact that they were lumbermen? A. That is right.

''Q. 38. You knew that these gentlemen were engaged in the business of purchasing lumber on the stump and cutting it and transporting it to the mill, and then selling the lumber after it had been cut? A. Yes, that is true.

''Q. 39. I believe you state that you knew that these men employed in their lumbering business what you referred to as rubber wheel log wagons? A. Well, they didn't state that then.

''Q. 40. I mean rubber tired log wagons? A. We found out they were—they used that, afterwards. I know they—I don't know what kind of wagons they used; they said 'log wagons', is what they said, that had—they had attached the rubber tires to this wagon.

''Q. 41. Well you knew, then, before this accident in question occurred, that they used in the lumbering business these rubber tired log wagons or trailers? A. I know they used them with teams, they said.

''Q. 42. Well, did you discuss that with them? A. Yes, I asked them how they used the—how they did

their logging, they said, with teams. Mr. Cisco who lives out south of town was one of their—he had his teams there.

"Q. 43. When was it that you asked them how they did their lumbering? A. I don't know, exactly, it was sometime during the writing up of that policy.

"Q. 44. Well, was it when you wrote up the workmen's compensation policy first, or was it when you later wrote up the public liability policy? A. It was in—er—during the—it was after we added the trucks; the workmen's compensation didn't have anything to do with it.

"Q. 45. It was while you were writing up the policy,—the fleet policy? A. Yes.

"Q. 46. And that was the first time you questioned them about the trailers? A. Yes, that is right.

"Q. 47. And you say you questioned them about the trailers? A. I questioned them about how they did their logging.

"Q. 48. And you learned that they did that with these log trailers? A. No; with the log wagons and teams.

"Q. 49. With rubber tires? A. Well, they didn't say anything about rubber tires.

"Q. 50. I thought I understood you to say you knew they used rubber tires on the trailers? A. No; I found out they did use them, but I didn't know what kind, they said log wagons.

"Q. 51. Well, then you learned, before this accident happened in June of 1956 that they did have

these rubber tired trailers? A. No, I didn't know that until it happened.

"Q. 52. You say you didn't know it until the accident happened? A. No, I saw it on the road that day. They just told me they had log wagons. Most of the log wagons, or a few of them use or put rubber tires on them because in the bottoms they don't mire down as badly,—that is the only reason they use the rubber tires.

"Q. 53. Did you ask them if they used these trailers or the log wagons on the open road? A. No, I didn't ask them then because—

"Q. 54. You never did ask them that? A. Because they told me that—er—I couldn't have—I could not have insured those if they had asked me.

"Q. 55. But my question is, Doctor, did you ask them if they used these on the log wagons? A. I didn't ask them,—no, I didn't ask them that; I asked them about their logging, the lumbering, their moving the logs and lumber.

"Q. 56. And you knew, Doctor, did you not, that from time to time Henry and Sain would have to move their logging equipment from one job site to another? A. Yes.

"Q. 57. And you knew that they would have to move these log wagons and trailers? A. Well, they had teams to move the wagons and the trucks—er—they could load part of it on the trucks and part of it they carried on these log wagons. That is the way they—

"Q. 58. But my question was, you knew that from time to time they would have to move these log trailers, or wagons, whatever you call them, from one job site to another? A. That is right.

"Q. 59. And you say you did not know that they were using these log trailers or log wagons on the open road? A. Well, they could use them to log,—limit them to teams.

"Q. 60. Is it your testimony, then, that you did know that they were using them on the open road with teams? A. Well,—er—I suppose they were, for they said they used the log wagons, or teams with the log wagons. I just —it is just a supposition that they used them on the roads.

"Q. 61. You assume, then, that they were using the log wagons on the open road, but pulling them with teams? A. Yes.

"Q. 62. Was that what you assumed? A. Yes, I didn't know how they moved their equipment, I—that wasn't my—that didn't come in any part of the—

"Q. 63. Well, now, Doctor, when these gentlemen came in to get these various forms of insurance from you, you knew that they were not skilled insurance men, didn't you? A. Well, I didn't—they were not supposed to know, they were not supposed to be skilled.

"Q. 64. You knew that they were relying upon you to write or get for them the type of policies that would protect them? A. Well, I asked them what they wanted, and that is what the—I got the information from them as to just what they wanted. They

said they wanted workmen's compensation and public liability and—er—and I asked them to give me a list of their equipment.''

The complainants expressly contradicted the testimony of Dr. Cox that he told them at the scene of the accident that they were not covered and that instead Dr. Cox stated to the investigating highway patrolman, Sergeant Moore, ''We carry the insurance, fire and casualty,'' and that nothing was said by Dr. Cox on that occasion to indicate that he had any doubt that the complainants were fully covered by liability insurance.

Sergeant Moore of the Tennessee Highway Patrol testified that he investigated the accident which occurred on June 21, 1956; that Dr. Cox was present at the scene of the accident taking pictures and that Dr. Cox told him that he carried the complainants' insurance.

Dr. Cox, in his deposition, said that he did not remember the complainants telling him about having to pay out money for the deaths of their two employees in the bridge accident referred to hereinabove.

The major and controlling conflict between the testimony of the complainants and the testimony of the defendant's witness, Dr. W. W. Cox, is this: The complainants insist that they contracted for full and complete liability coverage on all of their timbering and lumbering operations; that they were assured by Dr. Cox by word and deed that the three policies issued to them were sufficient to give them full and complete liability coverage; and that they accepted said policies and relied upon such assurances to them from Dr. Cox.

On the other hand the defendant insists that its agent, Dr. Cox, did not assure the complainants that the three policies issued to them were sufficient to give them full and complete liability coverage on all of their timbering and lumbering operations; that Dr. Cox only purported to write them coverage on the particular items of personal property and on the particular lumbering operations which they asked for and which were covered under the terms of the three policies and that Dr. Cox did not assure them that they had complete liability coverage on all of their timbering and lumbering operations.

The complainants in their original bill demanded a jury to try the issues of fact in this case.

█ If there is any material evidence to sustain a decree on an issue of fact, which is cognizable or triable at law, the Chancellor must submit such issue to the jury, and the finding of the jury has the same force and effect as in a court of law. T. C. A. secs. 21-1011 and 21-1016; Davis v. Mitchell, 27 Tenn. App. 182, at page 196, 178 S. W. (2d) 889, at page 895; Buice v. Scruggs Equipment Co., Inc., 37 Tenn. App. 556, at page 563, 267 S. W. (2d) 119, at page 122; Bovay v. Bovay, 27 Tenn. App. 332, at page 335, 181 S. W. (2d) 157, at page 158.

Therefore, the question is presented whether or not the complainants would be entitled to a decree if we assume that the jury would find the issues of fact as insisted upon by the complainants. If so, then of course, His Honor the Chancellor was in error in withdrawing the case from the jury and finding the facts himself.

█ If we assume that Dr. Cox did assure the complainants that they had complete liability coverage on all of their usual timbering and lumbering operations, then

we must infer that he did so because of some error on his part because there is no suggestion of fraud or intentional wrongdoing on the part of Dr. Cox.

In our opinion it is not necessary to determine in just what manner Dr. Cox was in error; that is, whether he misconstrued the contracts; or forgot about the provisions of the motor vehicle policy excluding coverage when the truck was pulling a trailer not covered in the policy; or forgot the provisions of the Manufacturers' and Contractors' policy excluding coverage when the accident involved an automobile or truck away from the premises of the sawmill itself; or forgot to include the trailers in the motor vehicle policy; or simply failed to obtain sufficient information from the complainants to enable him to write policies giving the complainants full liability coverage. The result was the same to the complainants. They were lulled into a false sense of security. They were misled to their prejudice.

See opinion of Justice (now Chief Justice) Neil in Church of Christ v. McDonald, 1943, 180 Tenn. 86, 171 S. W. (2d) 817, 146 A. L. R. 1173, quoted by this Court in the case of Phelan v. Phelan, 1956, 43 Tenn. App. 376, 309 S. W. (2d) 387.

''In an action on a contract of insurance, the insurance company is generally considered estopped to deny liability on any matter arising out of the fraud, misconduct, or negligence of an agent of the company. If either party must suffer from an insurance agent's mistake, it must be the insurance company, his principal.'' 29 Am. Jur. p. 634—Section 833—Mistake, Negligence, or Fraud of Agent, Generally.

Dr. Cox was the agent of the defendant, Southern Fire Insurance Company. T. C. A. sec. 56-705.

The credibility of Dr. Cox as a witness for the defendant is primarily a question for the jury. However, when we consider the fact that Hardeman County is a rural county of West Tennessee in which lumbering is one of the more important businesses; that the complainants bought, cut and sawed timber not only in Hardeman County but several other counties in West Tennessee; that they moved their sawmill site and all equipment several times each year; that the distance from one mill site to another varied from 5 miles to 100 miles or more; that Dr. Cox was thoroughly familiar with their entire operation including the practice of moving mill sites from time to time, as he testified, we find it very difficult to believe that he really thought these complainants were accustomed to moving the trailers by teams over the public road or highway sometimes a distance of 100 miles or more. On the day of this unfortunate accident they were in the process of moving their mill site a distance of 40 miles.

The record suggests that the complainants did not own the teams which they used to pull the trailers in the woods but that rather they hired such teams. Assuming they did own such teams for such purposes, it would appear that the most logical and efficient manner of moving the timbering equipment over ten miles away to a new site, would be to load the mules or horses in the trucks, and pull the trailers behind the trucks, not to drive the teams and pull the trailers over the public highway.

The defendant insurance company offered no proof to corroborate Dr. Cox in his statement that he could not

have insured the trailers if he had been asked to do so. The express provisions of the excluding clause quoted above indicates to the contrary; namely, that insurance can be obtained on trailers being pulled behind commercial trucks but that the trailers themselves must be described in the policy.

■ Complainants sought to impeach Dr. Cox's statement by showing that they had obtained insurance on the trailers in another company along with the trucks without any additional premium therefor. We think His Honor the Chancellor should have allowed the admission of this evidence.

Assuming that the complainants asked Dr. Cox for complete liability coverage, then certainly Dr. Cox was under an obligation to call the attention of the complainants to the Exclusion clauses of the policy. So far as the record shows this was not done.

In Dickens v. St. Paul Fire & Marine Ins. Co., 1936, 170 Tenn. 403, 95 S. W. (2d) 910, the agent wrote a fire insurance policy on a house owned by husband and wife but the policy named only the husband. The agent never talked with either the husband or wife but wrote the policy at the request of a mutual friend. The policy contained a provision that the insurance was not in force if the interest of the insured be other than sole and unconditional ownership. After a fire the company denied liability on the grounds that the wife owned an interest in the property. The Supreme Court held that the agent and therefore the company under such circumstances would be deemed to have waived the condition of the policy relating to sole and unconditional ownership and affirmed a judgment for the amount of the policy.

In the case of Baird v. Fidelity-Phenix Fire Ins. Co., 1942, 178 Tenn. 653, 162 S. W. (2d) 384, 140 A. L. R. 1226, the local agent issued a fire insurance policy on property in the name of Malcolm Baird, Executor of the estate of Mrs. Mollie Chambers. The policy contained a provision that the insurance was void if the interest of the insured be other than sole and unconditional ownership. At the time the policy was issued the agent knew that there was some dispute about the title and that litigation to construe the wills of Mr. Chambers and Mrs. Chambers would be necessary to determine the actual ownership of the property. Subsequent litigation determined that the Executor of Mrs. Chambers had no title at all. Held: Executor still entitled to recover on the policy on the theory of estoppel by waiver.

In Commercial Standard Ins. Co. v. Paul, 1951, 35 Tenn. App. 394, 245 S. W. (2d) 775, the local agent wrote a liability policy on an automobile naming the mother as insured owner when in fact her daughter was the real owner of the automobile. Mother and daughter testified that they told the agent on the telephone that the daughter was the owner of the automobile. The agent testified that he did not remember the conversation and thought the mother owned the automobile. In an opinion by Judge Howard, the Eastern Section of this Court applied the doctrine of estoppel by waiver and also allowed a reformation of the policy more than two years after its execution, delivery and acceptance.

In T. H. Hayes & Sons v. Stuyvesant Ins. Co., 1952, 194 Tenn. 35, 250 S. W. (2d) 7, the salesman for Union Chevrolet Company sold a customer a truck with knowledge that it was to be converted into an ambulance. Union

Chevrolet, as agent for defendant Insurance Company, also issued and delivered to purchaser a policy of fire and collision insurance on the truck. After a loss the insurance company denied liability on the grounds that the truck had been converted into an ambulance without its knowledge or consent. The Supreme Court held that knowledge of the agent, Union Chevrolet Company, that the truck was to be converted was imputable to its principal, the defendant insurance company, and that acquiescence by the dealer constituted a waiver on the part of the company.

See also City of Lawrenceburg v. Maryland Casualty Co., 16 Tenn. App. 238, 64 S. W. (2d) 69.

We copy with approval the following quotation from the case of Hully v. Aluminum Company of America, D. C. Iowa 1956, 143 F. Supp. 508, 513, cited by complainants:

"An insurance company is estopped to take advantage of a condition which its agent by mistake or negligence has failed to handle properly in the policy. Wensel v. Property Mut. Ins., Ass'n of Waterloo, 1906, 129 Iowa 295, 105 N. W. 522; Mutual Ben. Life Ins. Co. v. Robison, 8 Cir., 1893, 58 F. 723, 22 L. R. A. 325. The mistake or negligence of the agent within the scope of apparent authority is the responsibility of the insurance company. Basta v. Farm Property Mut. Ins. Ass'n of Iowa, 1933, 217 Iowa 240, 252 N. W. 125; cf. I. C. A. Sec. 515.125 (insurance agent is the agent of insurance company). Where the company or its agent delivers to the insured a policy which is known, or should be known, to be defective, such conduct is a representation that the policy is

valid and effective for the purpose intended. Dryer v. Security Fire Ins. Co., Iowa 1900, 82 N. W. 494; Vance, Insurance (3rd ed. by Anderson 1951), 533; cf. Quinn v. Mutual Benefit Health & Acc. Ass'n of Omaha, 1952, 244 Iowa 6, 55 N. W. (2d) 546. And the insured, if he is ignorant of the defect and has no special competence or experience in insurance matters, is privileged in Iowa to rely upon that representation without reading or being charged with knowledge of the contents of the policy. McComb v. Council Bluffs Ins. Co., 1891, 83 Iowa 247, 48 N. W. 1038; Lankhorst v. Union Fire Ins. Co., 1945, 236 Iowa 838, 20 N. W. (2d) 14; But cf. Preston v. Howell, 1934, 219 Iowa 230, 257 N. W. 415, 97 A. L. R. 1140 (rule as to other written contracts). The insured, by trusting in the skill and competence of the agent and paying the premiums for expected protection, would be prejudiced if the insurance company were allowed to assert the condition avoiding liability.''

Other cases cited and relied upon by complainants which allowed recovery against the several corporate insurance companies on the theory of the negligence of the local agent are: Kansas City Life Ins. Co. v. Cox, 6 Cir., 1939, 104 F. 321; Tobacco Redrying Corp. v. United States Fidelity & Guaranty Co., 1937, 185 S. C. 162, 193 S. E. 426.

Defendant appellee relies upon the general rule that equity will not reform a written instrument on the grounds of mistake except when the proof is clear and convincing. Jones v. Jones, 1924, 150 Tenn. 554, at pages 594-595, 266 S. W. 110, at pages 120-121.

In the present case, however, assuming always that the complainants can convince the jury that Dr. Cox assured them of full liability coverage, they are entitled to recover under the terms of the Motor Vehicle Policy itself without reforming the contract.

The company accepted liability for the accident in this case by the general terms and insuring agreements of the policy; if the jury finds the issues in favor of the complainants, the company will be estopped to rely upon the terms of the Exclusion clause as a defense.

Nor do we think the complainants are to be repelled because they did not read their policies.

"Courts in most jurisdictions take judicial notice of the fact that it is customary for insureds to accept policies and keep them without reading them. Vance on Insurance, (2d) Ed., 214-224, and numerous cases there cited." Nat. Life & Accident Insurance Co. v. Blackburn, unreported, quoted in Berryhill v. Mutual Benefit Health & Accident Ass'n, 37 Tenn. App. 303, 306, 262 S. W. (2d) 878, 879.

In Commercial Standard Ins. Co. v. Paul, 35 Tenn. App. 394, at pages 404 and 405, 245 S. W. (2d) 775, at page 780, this court said:

"'In such a case the insurer is not entitled to invoke the rule that the negligence of the insured in failing to read and understand the policy, and in retaining it, will preclude relief in equity. It will not work an estoppel upon the assured. In 26 C. J. 107, the rule is stated that a mere failure to read the policy, especially if it is a renewal, is not such negligence as will defeat the right to reformation, citing

Palmer v. Hartford (Fire) Insurance Company, 54 Conn. 488, 9 A. 248; Roberts & Son v. National Insurance Company, 2 Ohio App. 463. In 2 Cooley's Briefs on Insurance, p. 1427, it is stated in the text that the rule that the negligence of the insured in retaining the policy will preclude relief in equity is not strictly applied. In Stevens v. Equity Mutual Fire Insurance Co., 66 Mont. 461, 213 P. 1110, it was said that an insured has a right to rely on the good faith of insurer and his agent, and it is not carelessness on his part to suppose that a policy has been issued that will give protection under the stated facts relating to the application, and, in an action for a fire loss where the policy did not conform to the statements made by the insured to the agent taking the application, the failure of the insured to inspect a policy after the receipt was not negligence barring recovery in action to reform the policy. The same rule was applied in Farwell v. Home Insurance Company, 5 Cir., 136 F. 93, 68 C. C. A. 557, and in Merchants' & Manufacturers' Inter-Insurance Alliance v. Hansen, Tex. Civ. App., 258 S. W. 257.' ''

Hence, we feel constrained to hold that His Honor, the learned Chancellor, was in error in withdrawing the issues from the jury. The assignments of error are sustained; a decree will be entered reversing the Court below and remanding the cause for a new trial on all issues.

The defendant will be taxed with the costs of this appeal.

Avery, P. J. (Western Section), and Bejach, J., concur.