### In re CITY & COUNTY INSURANCE AGENCY, INC.; City & County Insurance Agency, Inc.; Inter-Agency Risk Managers, Inc., Debtor.

**Bankruptcy No. 3–83–01147.**

United States Bankruptcy Court,
E.D. Tennessee.

Feb. 15, 1985.

MEMORANDUM AND ORDER ON
OBJECTION TO CLAIM NO. 14

CLIVE W. BARE, Bankruptcy Judge.

Debtor, an independent insurance agency engaged in the business of insurance sales and services, filed its chapter 11 petition on July 22, 1983. Two Netherlands Antilles corporations, N.V. Menlo Corporation and Minford, N.V. Inc., and their agent, Milton A. Turner, a real estate developer, filed a proof of claim in the amount of $3,700,000. The claim arises from the fire damage to property in Brunswick, Georgia, known as the Brunswick Mall Shopping Center. Although debtor denies any liability, the claimants now contend they have suffered damages totaling $1,548,558.92 as a consequence of debtor's negligence and failure to settle their fire loss claim. As described by claimants, the elements of their damage claim are:

(1) debtor's failure to provide replacement cost insurance coverage — $800,811.89
(2) debtor's failure to provide up to building code enforcement — $218,000.00
(3) lost rents caused by debtor's failure and refusal to adjust and settle this claim — $529,747.03

I

For a period of five or six years previous to bankruptcy the debtor procured insurance coverage on not less than twenty-five properties in which Milton A. Turner owned an interest. Prior to issuance of the insurance policy in question, Turner told debtor's representative responsible for his account he wanted full coverage on his properties and that in the event of loss he wanted to replace improvements without any out-of-pocket expense other than any agreed deductible.

Debtor originally obtained a replacement cost policy on the Brunswick Mall property through Aetna. However, Holland America submitted a more competitive bid in response to debtor's solicitation. On March 16, 1983, Holland America issued an all risk policy, including a business interruption clause, on the Brunswick Mall.

Kennerly, Montgomery & Finley, G. Wendell Thomas, Jr., John B. Waters, III, Knoxville, Tenn., for claimants.

Butler, Vines, Babb & Threadgill, John O. Threadgill, Knoxville, Tenn., Weinberger, Weinstock, Sagner, Stevan & Harris, Sanford A. Harris, Baltimore, Md., for debtor.

Debtor's representative mistakenly assumed the policy provided replacement cost coverage. In fact, the policy explicitly recites:

> 4. *Valuation.* The Company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value with proper deduction for depreciation....[1]

Because he relied upon the debtor's expertise, neither Turner nor any of his employees read the Holland America policy.

In September 1983, fire destroyed a substantial portion of the Brunswick Mall. Claimants sought payment under their policy with Holland America, which employed Joe Eudy to adjust the claim. Eudy specializes in adjusting large fire losses and major business interruption claims; he has twenty-nine years experience as a claims adjuster. Through his discussions with Eudy, Turner learned for the first time that Holland America's liability for the property damage was limited to the actual cash value of the premises destroyed. Eudy also informed Turner that the Holland America policy did not include an endorsement covering increased costs attributable to changes in building code standards. (Turner had never discussed building code coverage with representatives of the debtor, and none of his insurance policies procured through the debtor included "up to code" coverage until April 1984.)

Eudy employed Wise Construction Company, Inc. (Wise), a South Carolina general construction company experienced in building shopping centers, to estimate the replacement cost at Brunswick Mall. Based on previous experience, Eudy was confi-

dent Wise would provide him with a detailed, proper estimate.[2] Wise's replacement cost estimate, after deduction for items Eudy could not approve, was $4,156,168. However, at Eudy's request, certain costs for cleaning and other work already performed at a store only partially damaged by the fire were excluded from the estimate. Also, the extent of damage to the slab was not apparent prior to completion of Wise's estimate. With adjustment for these two factors, Eudy determined the replacement cost, including tenant finishes, totaled $4,568,825.95.[3] Based on the parties' agreement on a depreciation factor of $857,000, the actual cash value of the portion of Brunswick Mall destroyed by fire was $3,711,825.95.

In settlement of its liability Holland America paid, and claimants accepted, $4,161,486.02. This sum consists of the actual cash value of the premises destroyed, $3,711,825.95, plus a $440,660.07 business interruption payment, plus an additional $10,000 apparently related to business interruption, less a $1,000 deductible. Two advance payments totaling $79,500 were made in 1983; the balance of the insurance proceeds was paid by a draft dated March 19, 1984.

Pursuant to their lease agreements with the tenants at Brunswick Mall, claimants are obliged to restore the premises with due diligence in the event of fire or other casualty. Hillman Construction Corporation has contracted to reconstruct the premises destroyed by fire for $4,602,980.[4] This sum includes a cost of $218,000 for a sprinkler system required to comply with the Brunswick building code, upgraded since the initial construction of Brunswick Mall. Subtracting $3,584,168.11,[5] the

---

1. No modifying endorsement is attached to the policy.

2. Eudy testified that he chose Wise because "[t]hey have done a lot of work for me in this area [fire loss adjustment]." Deposition of Joe L. Eudy at 12.

3. This amount does not include the cost of a sprinkler system required to comply with the current building code in Brunswick, Georgia.

4. Hillman's original contract, dated October 1, 1984, provided for a maximum reconstruction cost of $4,300,000. Due to delay in commencement the contract has been amended to increase the maximum reconstruction cost to $4,602,980.

5. This figure represents the difference between the $3,711,825.95 (actual cash value) insured property loss and expenses totaling $127,657.84 for debris removal, temporary security measures, and repair of a partially damaged store.

amount available from the insurance proceeds for rebuilding, from the Hillman contract price, claimants assert damages of $1,018,811.89 due to debtor's failure to procure a replacement cost policy with an "up to code" endorsement.

Debtor concedes it did not secure the coverage requested by Turner due to an oversight. However, debtor insists its own negligence is excused by claimants' failure to read the Holland America policy. Alternatively, debtor disputes the cost to replace the improvements at Brunswick Mall. In support of its alternative position, debtor proffered the testimony of A.W. Hutchison, III, a self-employed engineer whose company provides construction management services. Hutchison has nearly twenty years of experience related to the construction industry. Although his experience with shopping center construction is limited, Hutchison maintains it is a relatively simple form of construction. He testified that he could rebuild Brunswick Mall as it was, including tenant finishes, but up to current code standards, for $3,668,937, an amount nearly $1,000,000 less than the Hillman contract price.

## II

■ The threshold question is one of choice of law. Contending it is inconsequential whether their claim is for breach of contract or negligence, claimants assert the law of Tennessee is applicable. Debtor argues the law of Georgia controls the interests of the parties under the Holland America insurance policy. Assuming arguendo debtor is correct, claimants and Holland America have already reached a settlement respecting claimants' rights under the policy actually issued. The claim at issue pertains to debtor's failure to procure insurance in conformity with Turner's instructions. This failure occurred in Tennessee, the situs of debtor's business operations. Tennessee law governs the contested claim whether it arises from breach of contract, *Sloan v. Jones,* 192 Tenn. 400, 241 S.W.2d 506 (1951) (lex loci contractus), or negligence, *Winters v. Maxey,* 481 S.W.2d 755 (Tenn.1972) (lex loci delicti).

■ Debtor insists its responsibility for failing to obtain the requested coverage is nullified by claimants' failure to read the Holland America policy. In support of its position that claimants had a duty to read their policy, debtor cites *Beasley v. Metropolitan Life Ins. Co.,* 190 Tenn. 227, 229 S.W.2d 146 (1950); *DeFord v. National Life & Accident Ins. Co.,* 182 Tenn. 255, 185 S.W.2d 617 (1945); *Montgomery v. Reserve Life Ins. Co.,* 585 S.W.2d 620 (Tenn. Ct.App.1979), *cert. denied;* and *Hardin v. Combined Ins. Co. of America,* 528 S.W.2d 31 (Tenn.Ct.App.1975), *cert. denied.* In each of these cases an insurance policy was unenforceable because the insured had signed an application containing material misrepresentations. The alleged failure of the insured to read the insurance application before signing did not excuse the material misrepresentation to the insurer. The claim in question, however, is readily distinguishable from these cases. Misrepresentation by the claimants is not an issue; they did not tender a false application to the debtor. An insurance applicant has a duty to read, or understand, the representations he makes in his application. This principle, however, does not necessarily extend to impose a duty on an insured to read his policy.[6] The court in *Henry v. Southern Fire & Casualty Co.,* 46 Tenn.App. 335, 330 S.W.2d 18 (1958), *cert. denied,* stated:

**6.** In *DeFord v. National Life & Accident Ins. Co.,* 182 Tenn. 255, 185 S.W.2d 617 (1945), the court reasoned that the obligation of an insured to read, or acquaint himself with, an application which he signs applies likewise to a policy he does not sign, but accepts and relies on. However, the statement is dictum. Also, five of the six cases cited in support of the proposition involve misrepresentation, and in the sixth, *Dickens v. St. Paul Fire & Marine Ins. Co.,* 170 Tenn. 403, 95 S.W.2d 910 (1936), recovery was allowed where the insured had not completed an application nor read his policy, which included a material inaccuracy as to his interest in the property insured.

■ Nor do we think the complainants are to be repelled because they did not read their policies.

■ "Courts in most jurisdictions take judicial notice of the fact that it is customary for insureds to accept policies and keep them without reading them. Vance on Insurance, 2d Ed., 214–224, and numerous cases there cited."

*Henry*, 46 Tenn.App. at 366, 330 S.W.2d at 32. (Citations omitted.)

■ Turner unequivocally instructed debtor's representative to obtain full coverage for his properties. Relying completely upon the debtor, Turner was lulled into a false sense of security prejudicial to claimants. Claimants' failure to read the insurance policy does not absolve the debtor, *Glisson v. Stone*, 4 Tenn.App. 71 (1926), *cert. denied,* especially since the Holland America policy was renewal coverage solicited by the debtor. *See Commercial Standard Ins. Co. v. Paul,* 35 Tenn.App. 394, 245 S.W.2d 775 (1951), *cert. denied.*

■ As a general rule, an insured damaged by a broker's failure to procure a proper policy may sue for either breach of contract or negligence. 43 Am.Jur.2d *Insurance* § 139 (1982).[7] Debtor, having assumed a duty, failed in its undertaking to obtain the insurance coverage requested for Brunswick Mall. Hence, debtor is liable for the difference between the amount that would have been due if the requested coverage had been provided and the amount paid by Holland America. *Id.*[8]

The amount of damages is strenuously disputed. Harold Hahn, an architect with one of Turner's companies, testified the proposed replacement structure is redesigned from the original and that claimants have done all they can to reduce costs. According to Hahn, the cost to rebuild Brunswick Mall pursuant to the Hillman construction contract is approximately $29.50 per square foot. Asserting it is an arm's length agreement, claimants observe that the Hillman construction contract price ($4,602,980) excluding the sprinkler system cost ($218,000) is less than Eudy's adjustment of the replacement value cost ($4,568,825.95).

On behalf of the debtor, Hutchison testified that the replacement structure, though approximating the original in size, is shaped quite differently. The replacement structure will adjoin an existing structure formerly unconnected with the original.[9] Hutchison estimates he could rebuild Brunswick Mall as it was, excluding tenant finishes but "up to code," at a cost of $22.02 per square foot. Including tenant finishes, Hutchison's replacement estimate ($3,668,937) slightly exceeds $23 per square foot. Hutchison testified that another mall, involving a more expensive type of construction, is presently under construction in Brunswick, less than one mile from the Brunswick Mall site, at a cost of only $20 per square foot. Five other malls, at unidentified locations in Georgia, priced by Hutchison either are being or were built at a cost between $18 to $23 per square foot, exclusive of site work expenses. Although he concedes claimants' use of some materials differing from those in the original probably is cost-saving, Hutchison testified that the Hillman contract price exceeds his estimate to restore the Brunswick Mall by approximately $1,000,000. Specifically,

7. Contrary to debtor's characterization, the contested claim is not based on any asserted right to reform the policy issued (and impose liability on Holland America). Instead, the claim is based on debtor's breach of duty to claimants.

8. Subject to certain conditions subsequent, claimants conveyed the Brunswick Mall to Pioneer Investment Services Company (PISCO), a related entity with the same beneficial owners as Menlo and Minford, to facilitate financing for reconstruction. The conditions subsequent include completion of and payment for reconstruction. Debtor nonetheless contends claimants are now barred from recovery for lack of an insurable interest. The contention is meritless. Claimants still have an interest in the Brunswick Mall property. PISCO will not pay claimants until fulfillment of the conditions subsequent. Also, claimants have a stake in the reconstruction due to contractual obligations to the former tenants to rebuild.

9. According to the original construction plans, the distance between the two structures was one hundred feet. See Exhibit 22.

Hutchison questions the necessity of the following items in the Hillman contract to restore the Brunswick Mall as it was: (1) concrete work—$269,000; (2) site work and other allowances—$275,000; (3) paving and curbs—$70,000; and (4) site work and sidewalks—$32,200. Additionally, Hutchison stated that he could perform the required electrical and mechanical work for approximately $400,000 less than Hillman.

On cross-examination claimants introduced a report, prepared by Hutchison's company in December 1983, some two months after the fire, reflecting an estimate of $4,010,717 to rebuild Brunswick Mall as it was but "up to code." The report also includes an estimate of $3,801,338 to replace the original with a redesigned structure including updated construction methods. Each estimate projects reusing the existing slab, contrary to the Hillman proposal. Also, each estimate excludes $177,648 in tenant finish work reportedly not disclosed on the original plans but allowed by Eudy in his adjustment, based on the estimate and investigation by Wise. Hutchison's report expressly recites that specific information concerning finish items was incomplete or lacking with respect to several stores. Accordingly, Hutchison's December 1983 estimate to rebuild Brunswick Mall as it was, with tenant

finishes as determined by Wise, would approach $4,200,000. To explain the difference of approximately $500,000 between his former and current estimates, Hutchison testified his former estimate was conceptual and prepared without a complete set of the original plans.[10]

The court concludes that the preponderance of the evidence favors finding that the replacement cost more closely approximates either Eudy's adjustment figure or the Hillman reconstruction price as opposed to either Hutchison's current or former estimate. The existing slab, admittedly damaged, is not reusable.[11] The estimated cost of a second slab, $190,000, is not included in Hutchison's estimates. It is also unclear whether Hutchison's estimates include approximately $175,000 representing certain charges excluded from the Wise estimate at Eudy's request but subsequently included in his adjustment.[12] Further, Eudy testified the Wise estimate upon which he relied was conservative and that there was no way to rebuild the Brunswick Mall as it was for $3,711,825.95, the actual cash value. Considering Eudy's twenty-nine years of experience and his expertise in adjusting major fire loss claims, the court finds his testimony quite reliable.[13] Also, the Hillman reconstruction contract was negotiated without any guarantee

10. Hutchison represents that conceptual estimates without the benefit of an architect's plans are generally ten to fifteen percent higher than estimates made by reviewing such plans. Specifically, Hutchison stated that his current estimate is based on the following reductions in his former estimate: (1) change interior partitions by substituting dry walls for masonry—$200,000 plus; (2) eliminate contingency cost—$100,000; (3) air conditioning and electrical changes—$84,200; (4) lower rough carpentry estimate—$62,065; and (5) job overhead reduction due to shortening project by three months—$42,000.

11. Hutchison's belief that the existing slab is reusable is based on a report from Law Engineering Testing Company. Claimants object to the admissibility of the report (Exhibit 24), contending it is hearsay and not within any exception to the hearsay rule, Fed.R.Evid. 802. The objection is sustained. The report, dated December 7, 1984, the same date as the hearing on debtor's objection to the claim, is calculated for use in litigating a claim; it is not within the hearsay exception for records of a regularly

conducted activity, Fed.R.Evid. 803(6). See *Trout v. Pennsylvania R.R. Co.,* 300 F.2d 826, 830 (3rd Cir.1962). Also, the report is not within the scope of the residuary exception, Fed.R. Evid. 803(24), because debtor did not inform claimants sufficiently in advance of the hearing of an intention to offer the report as evidence. Assuming arguendo that the report is admissible, the court is not persuaded that the existing slab is fit for reuse.

12. See text following note 2, *supra.* The charges aggregating approximately $175,000 represent repairs at the Belks store, cleaning, electrical, and plumbing expenses. (See Exhibit 17.)

13. Although Eudy's adjustment is based on the Wise estimate (see note 2, *supra,* and accompanying text), he is familiar with construction costs. Eudy has taught classes to insurance adjusters on both adjustment of property losses and estimating construction costs. He also lectures on the subject of business interruption in insurance courses at the University of South Carolina.

claimants would recover the difference between replacement cost and actual cash value from the debtor or its errors and omissions insurer. Thus, it was in claimants' best interest to negotiate for reconstruction at a minimal cost.

If the debtor had procured replacement cost coverage the insured loss would have been the smallest of:

(1) the amount of this policy applicable to the damages or destroyed property;

(2) the replacement cost of the property or any part thereof identical with such property on the same premises and intended for the same occupancy and use; or

(3) the amount actually and necessarily expended in repairing or replacing said property or any part thereof.[14]

Claimants are entitled to a claim against the debtor equaling the difference between the amount available from the insurance proceeds for rebuilding ($3,584,168.11) and the amount actually and necessarily expended in reconstructing Brunswick Mall. Disallowing items in the Hillman contract not directly related to the fire loss, and thus not necessary replacement items,[15] the claim equals $890,811.89, inclusive of a $218,000 sprinkler system necessary to comply with current building code standards. Though "up to code" coverage was never specifically discussed by debtor's employees and Turner before the Brunswick Mall fire loss, this coverage should have been obtained. Turner unequivocally instructed debtor's representative to provide full coverage for his properties. He clearly communicated he wanted to be able to re-

place any improvement subject to a casualty loss without any expense apart from the policy deductible.[16] Payment of this claim, however, is contingent upon the actual expenditure of the sums necessary to rebuild Brunswick Mall in accordance with the Hillman reconstruction contract. See *Higgins v. Insurance Co. of North America*, 256 Or. 151, 469 P.2d 766 (1970). Also, debtor is entitled to set off any increase in the premium which would have been payable for replacement cost and "up to code" coverage.

### III

Claimants ask the court to allow inclusion in their claim of $529,747.03 attributable to lost rents. As previously noted, claimants have an obligation to their tenants to rebuild Brunswick Mall. The tenants had a correlative obligation to remain if after any casualty loss the premises were restored with due diligence.[17] If reconstruction had commenced in March 1984, when Holland America paid $4,081,986.02 to claimants, it could have been completed in December 1984. However, reconstruction was not commenced until December 1984, and will not be completed until September 1985. Thirty-three of claimants' forty-one tenants on the date of the fire loss will not return.

Claimants were forced to seek financing to rebuild because the insurance proceeds were not available to them.[18] The initial financing arrangement reportedly collapsed due to debtor's failure to assure claimants the depreciation factor (the difference between replacement cost and actual cash

**14.** See Replacement Cost Endorsement, Exhibit 2.

**15.** The items disallowed as unnecessary are:

| | |
|---|---|
| Landscaping | $25,000 |
| Sign and Logo | 4,000 |
| Boulevard Entrance and roadway | 25,000 |
| Site lighting | 10,000 |
| Paving and curbs | 70,000 |
| | $134,000 |

In accordance with Hutchison's December 1983 report, $6,000 is allowed to cover repair of asphalt damaged during the reconstruction process.

**16.** Building code compliance coverage was available when the Holland America policy was issued. Cf. *E.K. Hardison Seed Co. v. Continental Casualty Co.*, 56 Tenn.App. 644, 410 S.W.2d 729 (1966), *cert. denied*, (impossible to obtain coverage asserted by claimant when policy issued).

**17.** All of the tenants had loss of income insurance coverage for a one-year period.

**18.** Claimants' first mortgagee, holding a mortgage note for nearly $2,000,000, elected to be repaid. The balance of the proceeds was paid, on demand, to satisfy another loan secured by the capital stock of Menlo and Minford.

value) would be paid. Alternative arrangements to rebuild were necessary, delaying the commencement of reconstruction until December 1984.

Claimants assert they notified the debtor in early 1984 that consequential damages would ensue if the debtor failed to adjust their claim and provide adequate assurance of payment of the depreciation factor. However, debtor's chapter 11 petition was filed on July 22, 1983, two months prior to the fire loss. Any claim for lost rents attributable to the postpetition delay in settlement or failure by debtor to assure payment of the depreciation factor is a postpetition claim, not allowable as a claim against the estate. 11 U.S.C.A. § 502(b) (1979).[19]

Claim No. 14 is allowed as a contingent claim in the amount of $890,811.89 less the premium increase which would have been payable if a policy affording replacement cost coverage with an "up to code" endorsement had been issued.[20]

· IT IS SO ORDERED.

**19.** Assuming arguendo that the claim for lost rents is a prepetition claim, somehow originating in debtor's failure to procure replacement cost coverage, it clearly was impossible for the *debtor* in early 1984 to assure claimants the depreciation factor would be paid. Debtor's schedules reflect liabilities, excluding the claim in question, totaling $2,215,277.67 and assets valued at only $99,268.31. Claimants could not in good faith expect assurance from the debtor of payment of the depreciation factor.

**20.** This amount is not within the record before the court.